Williams v Beemiller, Inc. (2018 NY Slip Op 00939)





Williams v Beemiller, Inc.


2018 NY Slip Op 00939


Decided on February 9, 2018


Appellate Division, Fourth Department


Peradotto, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 9, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: PERADOTTO, J.P., CARNI, DEJOSEPH, AND WINSLOW, JJ.


1438 CA 17-00501

[*1]DANIEL WILLIAMS AND EDWARD WILLIAMS, PLAINTIFFS-RESPONDENTS,
v
BEEMILLER, INC., DOING BUSINESS AS HI-POINT, ET AL., DEFENDANTS, AND CHARLES BROWN, DEFENDANT-APPELLANT. 






SCOTT L. BRAUM & ASSOCIATES, LTD., DAYTON, OHIO (SCOTT L. BRAUM, OF THE OHIO BAR, ADMITTED PRO HAC VICE, OF COUNSEL), AND BARCLAY DAMON LLP, BUFFALO, FOR DEFENDANT-APPELLANT.
BRADY CENTER TO PREVENT GUN VIOLENCE, LEGAL ACTION PROJECT, WASHINGTON, D.C. (JONATHAN E. LOWY, OF THE WASHINGTON, D.C. BAR, ADMITTED PRO HAC VICE, OF COUNSEL), AND CONNORS & VILARDO, BUFFALO, FOR PLAINTIFFS-RESPONDENTS.


Peradotto
 Appeal from an order of the Supreme Court, Erie County (Diane Y. Devlin, J.), entered July 20, 2016. The order denied the motion of defendant Charles Brown for summary judgment dismissing the first amended complaint against him. 
It is hereby ORDERED that the order so appealed from is unanimously reversed on the law without costs, the motion is granted, and the first amended complaint is dismissed against defendant Charles Brown.
Opinion by Peradotto, J.P.:
In this appeal, we must determine whether defendant Charles Brown, an out-of-state seller of firearms who sold a gun that was transported to New York and used in a shooting, is subject to personal jurisdiction in this state. We hold that the exercise of personal jurisdiction under New York's long-arm statute does not comport with federal due process under the circumstances of this case.
I
As we explained when this case was previously before us in the context of motions to dismiss by three defendants (Williams v Beemiller, Inc., 100 AD3d 143 [4th Dept 2012], amended on rearg 103 AD3d 1191 [4th Dept 2013]), plaintiffs commenced this action seeking damages for injuries sustained by Daniel Williams (plaintiff) in an August 2003 shooting in Buffalo. Plaintiff, a high school student, was shot in the abdomen by defendant Cornell Caldwell, who apparently misidentified plaintiff as a rival gang member. The gun used to shoot plaintiff was identified as a Hi-Point 9mm semiautomatic pistol manufactured by defendant Beemiller, Inc., doing business as Hi-Point (Beemiller), an Ohio corporation and a federally licensed firearms manufacturer. Beemiller sold the gun to defendant MKS Supply, Inc. (MKS), an Ohio corporation and a federally licensed wholesale distributor of firearms. MKS then sold the gun to Brown, who held a federal firearms license (FFL) in Ohio and sold guns at retail as Great Lakes Products (Great Lakes).
During several sales at Ohio gun shows in 2000, Brown sold 181 guns, including the gun at issue, to defendants James Nigel Bostic and his associates, including Kimberly Upshaw. [*2]According to plaintiffs, Bostic was a gun trafficker who regularly traveled to Ohio and used "straw purchasers"—such as Upshaw—to obtain large numbers of handguns for resale on the streets of Buffalo. Indeed, Bostic eventually pleaded guilty to federal firearms trafficking violations and was sentenced to 87 months in prison.
In the first amended complaint (hereafter, complaint), plaintiffs alleged, inter alia, that Beemiller, MKS, and Brown (collectively, defendants) "negligently distributed and sold the Hi-Point handgun in a manner that caused it to be obtained by Caldwell, an illegal and malicious gun user and possessor, and then to be used to shoot [plaintiff]." According to plaintiffs, Beemiller and MKS intentionally supplied handguns to irresponsible dealers, including Brown, because they profited from sales to the criminal gun market. Brown, in turn, sold numerous handguns, including the subject gun, to Bostic and Upshaw, even though he knew or should have known that they "intended to sell these multiple guns on the criminal handgun market, to supply prohibited persons and criminals such as Caldwell with handguns." Plaintiffs alleged six causes of action against defendants.
In lieu of answering, defendants each moved to dismiss the complaint against them and, in his motion, Brown asserted, inter alia, that he was not subject to personal jurisdiction in New York (see id. at 152). Supreme Court dismissed the action against Brown for lack of jurisdiction, but we reversed on appeal, holding in relevant part that plaintiffs made a sufficient start to warrant further disclosure on the issue whether personal jurisdiction could be established over Brown (see id. at 152-154.1).
In his subsequent answer, Brown asserted various affirmative defenses, including that the court lacked personal jurisdiction over him. Following jurisdictional discovery, Brown moved for summary judgment dismissing the complaint against him. In its bench decision, the court concluded that plaintiffs had established the requisite elements for the exercise of long-arm personal jurisdiction over Brown under CPLR 302 (a) (3), including that Brown derived substantial revenue from guns used in New York and from interstate commerce. The court also concluded that plaintiffs had demonstrated that "Brown had some knowledge that guns would end up in New York" inasmuch as the submissions showed that a significant number of guns sold by Brown were used in criminal activity in Buffalo and that a statement was made to Brown that Bostic and Upshaw planned to open a gun store in Ohio and one in Buffalo. Brown appeals from the order denying his motion for summary judgment.
II
It is well established that "the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Thus, "[a] party moving for summary judgment must demonstrate that the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment' in the moving party's favor" (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833 [2014], quoting CPLR 3212 [b]). "This burden is a heavy one and on a motion for summary judgment, facts must be viewed in the light most favorable to the non-moving party' " (William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475 [2013]), "and every available inference must be drawn in the [non-moving party's] favor" (De Lourdes Torres v Jones, 26 NY3d 742, 763 [2016]). If the moving party makes a prima facie showing, "the burden then shifts to the non-moving party to establish the existence of material issues of fact which require a trial of the action' " (Jacobsen, 22 NY3d at 833). To the extent that the parties dispute the applicable standard, we note that the same burden-shifting framework applies where, as here, a defendant moves for summary judgment on the affirmative defense of lack of long-arm personal jurisdiction (see e.g. Andrew Greenberg, Inc. v Sirtech Can., Ltd., 79 AD3d 1419, 1421 [3d Dept 2010]; Dreznick v Lenchner, 41 AD3d 769, 770 [2d Dept 2007]; Kesterson v Cambo Fotografische Industrie BV, 30 AD3d 301, 301 [1st Dept 2006]; Schultz v Hyman, 201 AD2d 956, 957-958 [4th Dept 1994]).
In determining whether the exercise of personal jurisdiction over a nondomiciliary defendant is proper, a court must assess whether the requirements of New York's long-arm statute have been met and, if so, whether a finding of personal jurisdiction comports with federal due process (see LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000]).
[*3]III
CPLR 302 (a) (3) provides, as relevant here, that a court may exercise personal jurisdiction over a nondomiciliary
"who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . if he [or she] (i) . . . derives substantial revenue from goods used or consumed . . . in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."
On appeal, Brown does not challenge the assertion of statutory long-arm jurisdiction on the ground that he did not commit a tortious act outside New York that caused injury to a person inside New York (see id.; see generally Penguin Group [USA] Inc. v American Buddha, 16 NY3d 295, 302 [2011]; LaMarca, 95 NY2d at 214). In any event, the record evidence suggests that Brown improperly sold the subject gun in Ohio to a gun trafficking ring (see e.g. Shawano Gun & Loan, LLC v Hughes, 650 F3d 1070, 1073 [7th Cir 2011]; see generally 18 USC §§ 2 [a]; 922 [m]), and establishes that the gun was later used to shoot and injure plaintiff in New York.
Statutory long-arm jurisdiction thus turns on whether Brown "derives substantial revenue from goods used or consumed . . . in [New York]" (CPLR 302 [a] [3] [i]), or whether he "expects or should reasonably expect [his tortious] act to have consequences in [New York] and derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3] [ii]; see Penguin Group [USA] Inc., 16 NY3d at 302; Ingraham v Carroll, 90 NY2d 592, 596 [1997]). Even assuming, arguendo, that Brown met his initial burden by establishing that he did not derive substantial revenue from goods used or consumed in New York or from interstate/international commerce, we conclude for the reasons that follow that plaintiffs' submissions in opposition to the motion established those statutory requisites.
Although "[a] uniformly dependable yardstick for what is or is not substantial' has not yet been devised," courts have applied both a proportion test and a quantity test to determine what constitutes substantial revenue within the meaning of CPLR 302 (a) (3) (Siegel, NY Prac § 88 at 165 [5th ed 2011]; see Allen v Canadian Gen. Elec. Co., 65 AD2d 39, 41-43 [3d Dept 1978], affd 50 NY2d 935 [1980]; Tonns v Spiegel's, 90 AD2d 548, 549 [2d Dept 1982]; Allen v Auto Specialties Mfg. Co., 45 AD2d 331, 333 [3d Dept 1974]). Under the former test, the defendant's overall revenue is compared to revenue from New York or interstate/international commerce (see Tonns, 90 AD2d at 549; Allen, 45 AD2d at 333; see also Siegel, NY Prac § 88 at 165-166). Under the latter test, revenue may be deemed "substantial" where the amount of revenue the defendant derives from New York or interstate/international commerce is great, even though it comprises only a small proportion of the defendant's overall business (see Allen, 65 AD2d at 42-43; see also Siegel, NY Prac § 88 at 165). In any case, the inquiry is fact-specific (see Allen, 65 AD2d at 42; Siegel, NY Prac § 88 at 165).
Here, with respect to CPLR 302 (a) (3) (i), we agree with plaintiffs that Brown's sales to the gun trafficking ring establish that he derived substantial revenue from guns used or consumed in New York. Plaintiffs' evidentiary submissions, in particular the copies of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Form 4473 for each transaction (see 27 CFR 478.124 [a]), establish that Brown sold 181 guns to Bostic and his associates between May and October 2000. Plaintiffs further provided evidence demonstrating that the guns sold to Bostic and his associates were " used or consumed'—i.e., possessed or discharged—in New York" (Williams, 100 AD3d at 154; see CPLR 302 [a] [3] [i]). Among other things, in his federal plea agreement, Bostic and the government agreed that, "after each purchase, [Bostic] took possession of all the firearms," which he then transported to Buffalo where he would "store the firearms at relatives' houses until he could find a buyer" and, by himself and through others, sell the guns for profit, usually at a rate of "double what he originally paid."
The evidence submitted by plaintiffs also establishes that the 181 guns sold to Bostic and his associates constituted approximately 34% of Brown's gun sales by volume in 2000. In addition, even considering as accurate plaintiffs' higher figure of over 4,100 total guns sold by [*4]Brown for the period 1996 to 2005, which includes additional retail sales and certain non-retail transfers reflected in the record that Brown does not count in his calculation, the 181 guns sold to Bostic and his associates represents 4.4% of Brown's total gun sales for that period (see generally Tonns, 90 AD2d at 549). As plaintiffs point out, Brown was largely unable to produce sales receipts during jurisdictional discovery, which would have contained the price of the guns. Nonetheless, Brown testified during his deposition in this case that the majority of the guns purchased by Bostic and his associates were of a discontinued model that sold at a discounted price of approximately $85 while other models were sold at a higher price. Even if all of the 181 guns obtained by Bostic and his associates had been sold by Brown at the discounted price, Brown would have generated revenue of over $15,000 from those sales. Although revenue in that range may not be particularly large in absolute terms relative to some other cases (cf. e.g. LaMarca, 95 NY2d at 213), we conclude under the circumstances of this case that the quantity of guns sold to Bostic and his associates, which constitutes approximately one-third of Brown's total sales in 2000, along with the evidence establishing the general price of the guns, is sufficient to establish that Brown derived substantial revenue from goods used or consumed in New York within the meaning of CPLR 302 (a) (3) (i) (cf. Murdock v Arenson Intl. USA, 157 AD2d 110, 113-114 [1st Dept 1990]).
In contrast to the substantial revenue requirement of CPLR 302 (a) (3) (i), the interstate/international commerce prong of CPLR 302 (a) (3) (ii) "requires no direct contact with New York" inasmuch as the other prong, i.e., the expectation of New York consequences, serves to "ensure[] that the defendant has some direct contact with New York" (Ingraham, 90 NY2d at 598-599). Rather, the interstate/international commerce prong of subdivision (a) (3) (ii) "narrows the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character' " (Ingraham, 90 NY2d at 599, quoting 12th Ann Report of NY Jud Conf, at 342-343; see Siegel, NY Prac § 88 at 168).
Here, even if the sales to Bostic and his associates were not counted as out-of-state sales, plaintiffs submitted evidence establishing that, from 1996 to 2005, Brown sold and transferred 404 guns to out-of-state purchasers. Such interstate transactions constitute over 9.8% of Brown's total sales by volume for that period, and that percentage would be 14.3% if the Bostic sales were included as out-of-state sales (see Darienzo v Wise Shoe Stores, 74 AD2d 342, 344-346 [2d Dept 1980]). In addition, even if we were to accept the admittedly incomplete figure set forth by Brown reflecting 190 out-of-state purchases during the relevant period, such interstate activity would constitute 5.3% of Brown's claimed sales by volume. Furthermore, as plaintiffs contend, Brown's deposition testimony establishes that Great Lakes attended various gun shows along the "I-75 corridor," which was accessible to buyers from states in the region such as Indiana and Kentucky, and Brown made legal sales of long guns to out-of-state residents as well. The gun shows provided approximately 85% of Brown's sales from 1996 to 2005. Given this evidence and the number of guns sold to out-of-state residents during the relevant period, we agree with plaintiffs that Brown's "business can hardly be characterized as local' " (LaMarca, 95 NY2d at 215; cf. Ingraham, 90 NY2d at 599-600).
The other prong of CPLR 302 (a) (3) (ii) requires an evaluation of whether Brown "expect[ed] or should reasonably [have] expect[ed his] act[s] to have consequences in [New York]." Even if the record arguably establishes that Brown expected or should have expected the sale of guns to Bostic and his associates to have consequences in New York, the evaluation of this prong implicates due process considerations under the circumstances of this case (see generally Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:3; Vincent C. Alexander, 2014 Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:2; Siegel, NY Prac § 88 at 91-92 [Jan. 2017 Supp]). We therefore proceed directly to an analysis of whether the exercise of personal jurisdiction under the long-arm statute comports with federal due process.
IV
We agree with Brown that principles of federal due process preclude New York from exercising personal jurisdiction over him. It is well established that the "[e]xercise of personal jurisdiction under the long-arm statute must comport with federal constitutional due process requirements" (Rushaid v Pictet & Cie, 28 NY3d 316, 330 [2016], rearg denied 28 NY3d 1161 [*5][2017], citing LaMarca, 95 NY2d at 216). First, a defendant must have "minimum contacts" with the forum state such that the defendant "should reasonably anticipate being haled into court there" (World-Wide Volkswagen Corp. v Woodson, 444 US 286, 291, 297 [1980]) and, second, the maintenance of the suit against the defendant in New York must comport with "traditional notions of fair play and substantial justice" (International Shoe Co. v Washington, 326 US 310, 316 [1945] [internal quotation marks omitted]).
With respect to the first component, "[a] non-domiciliary tortfeasor has minimum contacts with the forum State—and may thus reasonably foresee the prospect of defending a suit there—if [he or she] purposefully avails [himself or herself] of the privilege of conducting activities within the forum State" (LaMarca, 95 NY2d at 216 [internal quotation marks omitted]; see World-Wide Volkswagen Corp., 444 US at 297). Thus, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State[; r]ather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there" (World-Wide Volkswagen Corp., 444 US at 297; see Burger King Corp. v Rudzewicz, 471 US 462, 474 [1985]; Schaadt v T.W. Kutter, Inc., 169 AD2d 969, 970 [3d Dept 1991]). To adhere to those principles, the inquiry into minimum contacts necessarily "focuses on the relationship among the defendant, the forum, and the litigation" (Walden v Fiore, — US &mdash, &mdash, 134 S Ct 1115, 1121 [2014] [internal quotation marks omitted]). "[T]he relationship must arise out of contacts that the defendant himself' creates with the forum State" (id. at 1122, quoting Burger King Corp., 471 US at 475). The Supreme Court has therefore "consistently rejected attempts to satisfy the defendant-focused minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State" (id.; see Helicopteros Nacionales de Colombia, S.A. v Hall, 466 US 408, 417 [1984]). Although "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties[,] . . . a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction" (Walden, — US at &mdash, 134 S Ct at 1123). In sum, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State" (id., quoting Burger King Corp., 471 US at 475; see Waggaman v Arauzo, 117 AD3d 724, 726 [2d Dept 2014], lv denied 24 NY3d 903 [2014]).
Applying the foregoing principles, we conclude that Brown lacks the minimum contacts with New York that are a prerequisite to the exercise of jurisdiction over him. Brown's submissions established that Great Lakes was an Ohio retailer permitted to sell guns within Ohio only and, during the relevant period from 1996 to 2005, it did not maintain a website, had no business telephone listing, did not advertise in New York, and made its retail sales and transfers to customers present in Ohio (see World-Wide Volkswagen Corp., 444 US at 288-289; Martinez v American Std., 91 AD2d 652, 653 [2d Dept 1982], affd for the reasons stated 60 NY2d 873 [1983]; Schultz, 201 AD2d at 957). The evidence submitted by plaintiffs in opposition does not tend to establish that Brown "purposefully reach[ed] out beyond' " Ohio and into New York (Walden, — US at &mdash, 134 S Ct at 1122; cf. Burger King Corp., 471 US at 479-480). Brown did not, for example, engage in a purposeful distribution arrangement thereby evincing an effort to serve the market for firearms in New York (cf. LaMarca, 95 NY2d at 213-214, 217; Darrow v Hetronic Deutschland, 119 AD3d 1142, 1144-1145 [3d Dept 2014]; Halas v Dick's Sporting Goods, 105 AD3d 1411, 1413 [4th Dept 2013]). Instead, Bostic and his associates came to Ohio gun shows where they purchased guns from Brown and then unilaterally elected to transport them to Buffalo for resale on the illegal market (see generally World-Wide Volkswagen Corp., 444 US at 298).
In seeking to establish the requisite minimum contacts with New York, plaintiffs rely upon Brown's testimony that Bostic mentioned being from Buffalo and discussed his purported intention or desire to open a gun store in Buffalo in addition to one in Ohio. Plaintiffs contend that Brown's knowledge that Bostic ostensibly planned or hoped to open a gun store in Buffalo gave Brown reason to believe that the guns would be resold in New York and indicated Brown's intent to serve the market there. We conclude, however, that Brown's knowledge that guns sold to Bostic might end up being resold in New York if Bostic's ostensible plan or hope came to fruition in the future is insufficient to establish the requisite minimum contacts with New York because such circumstances demonstrate, at most, Brown's awareness of the mere possibility that the guns could be transported to and resold in New York (see World-Wide Volkswagen Corp., [*6]444 US at 297). The Supreme Court has long rejected the notion that a defendant's amenability to suit simply "travel[s] with the chattel" (id. at 296; see J. McIntyre Mach., Ltd. v Nicastro, 564 US 873, 891 [2011, Breyer, J., concurring]). In addition, plaintiffs' proposed approach would impermissibly allow the contacts that Bostic, a third party, had with Brown and New York "to drive the jurisdictional analysis" (Walden, — US at &mdash, 134 S Ct at 1125; see J. McIntyre Mach., Ltd., 564 US at 891 [Breyer, J., concurring]). In short, Brown did not " purposefully avail[ himself] of the privilege of conducting activities within [New York]' " (World-Wide Volkswagen Corp., 444 US at 297) and, therefore, he lacks the requisite minimum contacts to permit the exercise of jurisdiction over him.
Furthermore, for the foregoing reasons, although Brown may have derived substantial revenue from the sale of guns in Ohio to Bostic and his associates that were then transported to and ultimately used or consumed in New York (see CPLR 302 [a] [3] [i]), such "financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction[ where, as here,] they do not stem from a constitutionally cognizable contact with that State" (World-Wide Volkswagen Corp., 444 US at 299).
In light of our determination, we have no occasion to reach the second component of the due process inquiry, i.e., whether exercising personal jurisdiction over defendant would comport with traditional notions of fair play and substantial justice (see e.g. Carpino v National Store Fixtures, 275 AD2d 580, 582 [3d Dept 2000], lv denied 95 NY2d 769 [2000]).
V
As an alternative ground for the exercise of personal jurisdiction over Brown, plaintiffs contend that New York has jurisdiction on the theory that MKS is Brown's agent and alter ego, and MKS does not dispute jurisdiction. We reject that contention inasmuch as the evidence adduced during jurisdictional discovery does not support plaintiffs' assertions.
Plaintiffs' agency theory fails because, even if MKS acted as Brown's agent for purposes of distributing the subject guns to Great Lakes, the evidence establishes that MKS was not acting as Brown's agent in committing the tortious act in Ohio that caused injury to plaintiff in New York, i.e., improperly selling the guns to Bostic and his associates (see CPLR 302 [a] [3]; cf. Darienzo, 74 AD2d at 346; Allen, 45 AD2d at 332-333; see generally Porter v LSB Indus., 192 AD2d 205, 212-215 [4th Dept 1993]).
Contrary to plaintiffs' further contention, the evidentiary submissions do not establish that MKS was Brown's alter ego at the time of the alleged tortious conduct, i.e., the sales to Bostic and his associates between May and October 2000. Brown was hired by MKS as a salesperson in 1993 and became a vice-president years later, but his responsibilities as an employee of MKS did not meaningfully change between 1993 and 2003. Brown was approached by the majority owners to purchase MKS in late 2002 or 2003. Brown obtained day-to-day control of MKS in 2003. Plaintiffs' assertion that Brown acknowledged during his deposition that MKS was a "one-man operation" from the beginning of his time at MKS in 1993 is without merit. A review of the deposition transcript in context reveals that, in response to a question regarding whether "anyone else at MKS ha[d] an FFL at that time," Brown responded that no one else at MKS, including the owners, had an FFL; Brown did not state that he was the only individual operating MKS. As a result, Brown is not subject to jurisdiction on the alternative theories proposed by plaintiffs.
VI
Accordingly, we conclude that the order should be reversed, Brown's motion should be granted, and the complaint against him should be dismissed.
Entered: February 9, 2018
Mark W. Bennett
Clerk of the Court