Filed 2/20/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| YOUSEF ZEHIA,<br><br>         Petitioner,<br><br>         v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>         Respondent;<br><br>NICHOLAS NADHIR,<br><br>         Real Party in Interest. | D076449<br><br><br>(Super. Ct. No. 37-2018-00036325-CU-DF-CTL) |

ORIGINAL PROCEEDINGS in mandate challenging order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Petition denied.


Callahan, Thompson, Sherman & Caudill, Lee A. Sherman and Randy Hy for Petitioner.

No appearance for Respondent.

Caldarelli Hejmanowski Page & Leer, Marisa Janine-Page, Jack R. Leer and Caitlin E. Macker for Real Party in Interest.

I

INTRODUCTION

In this writ proceeding, we address whether California may exercise specific personal jurisdiction over a nonresident defendant who sent allegedly defamatory statements to California residents through private online social media messages with the aim of interfering with the residents' personal relationships. Resident Nicholas Nadhir sued nonresident defendant, Yousef Zehia, for defamation, violation of the online impersonation law (Pen. Code, § 528.5), appropriation of name or likeness, and intentional infliction of emotional distress based on the conduct just described. Zehia moved to quash service of summons and the trial court denied the motion to quash on grounds that the exercise of specific personal jurisdiction over Zehia was proper.

We conclude Zehia's suit-related conduct created a substantial connection between Zehia and California sufficient to support the exercise of specific personal jurisdiction over him. Therefore, the trial court correctly denied the motion to quash. Zehia's writ petition is denied.

II

BACKGROUND

A

In June 2018, Nadhir and S.M. participated in an arranged introduction at a church organized by their family members. S.M. had never met Nadhir and believed her extended family member, Zehia, may be familiar with him. Therefore, she told Zehia about the introduction and asked Zehia for information about Nadhir.

Soon after, Nadhir received direct messages on a social media platform sent from usernames he did not recognize. Nadhir also received friend requests on the social media platform from usernames he did not recognize, including one called "[S.M.]does.not.want.this." Nadhir denied the friend requests.

Nadhir then received a direct message on the social media platform from a username called "nick.check.your.dm.request." The message read: "[S.M.] is finding this whole thing very stressful and as an invasion of privacy, she is not happy and is being pressured by her family. Best thing is to just let this whole thing go and everyone move on. [¶] Tell the moms and aunts to just drop the whole thing. She is finding this to be very unnatural."

The arranged introduction between Nadhir and S.M. took place as planned. However, a few days after the introduction, Nadhir received another social media friend request from a username called "[S.M].ant.is.driving.her.crazy." Nadhir did not recognize the username and denied the friend request.

Over the next few weeks, Zehia told S.M. he was in communication on social media with an anonymous user familiar with Nadhir. According to Zehia, the anonymous user warned him that S.M. was "walking into a trap," Nadhir viewed S.M. "as a piece of meat," and Nadhir "ruined a lot of Chaldean girls [*sic*] reputations" in San Diego. Zehia claimed the anonymous user forwarded him direct message and text message conversations between the anonymous user and Nadhir. In those conversations, the individual purporting to be Nadhir made sexually-explicit statements about S.M. and derogatory statements about her family. Using the social media platform, Zehia sent

3

S.M. screenshots of his alleged conversations with the anonymous user. He also sent her screenshots of the anonymous user's alleged conversations with Nadhir.

B

Nadhir denied making the statements attributed to him and filed an unverified complaint against unnamed doe defendants for defamation, violation of the online impersonation law, appropriation of name or likeness, and intentional infliction of emotional distress. Nadhir sought and obtained court permission to propound discovery to learn the identity of the doe defendants. After conducting the discovery, Nadhir came to believe Zehia created the social media usernames at issue, sent the friend requests and direct messages to Nadhir, and fabricated the disparaging conversations he sent to S.M. Therefore, he amended the complaint to substitute Zehia as a doe defendant.

After Zehia was served with process in Michigan, he made a special appearance to contest personal jurisdiction and filed a motion to quash service of summons. Together with the motion to quash, Zehia filed a declaration in which he averred he was a resident of Michigan and had never resided in California. Zehia denied making the allegedly defamatory comments and fabricating the conversations he sent to S.M. Further, he argued the alleged conduct, even if true, did not amount to an intentional targeting of California. Instead, it demonstrated only that someone made harmful online statements about Nadhir, a California resident, with knowledge he would suffer harm in California.

Nadhir filed an opposition to the motion to quash in which he argued the court could exercise personal jurisdiction over Zehia because he engaged in "purposeful and harassing contacts with California and its residents." In particular, he asserted Zehia sent

4

harassing messages directly to a California resident (Nadhir), intended to disrupt a developing relationship between California residents (Nadhir and S.M.), fabricated text message and direct message conversations involving a California resident (Nadhir), and transmitted the fabricated conversations to a California resident (S.M.). Together with his opposition brief, Nadhir filed declarations from himself, S.M., and his counsel.

Nadhir's counsel averred in her declaration that she served a subpoena for business records on the social media company at issue and, based on the records produced, learned the Internet Protocol (IP) addresses for the social media usernames implicated in the lawsuit. She stated she used a publicly accessible Internet website to learn the locations and service providers associated with the IP addresses, served subpoenas for business records on the service providers, and, based on the records produced, learned that phone numbers and electronic devices belonging to Zehia and his father had signed onto the social media usernames at issue in Michigan. Copies of the subpoenaed business records were not attached to the declaration.[1]

In S.M.'s declaration, S.M. described her initial request to Zehia for information about Nadhir and the screenshots of the alleged conversations she received from Zehia. According to S.M., Zehia expressed concerns to her that his name "might appear" on a "server" connected to the anonymous user. However, Zehia explained the only reason his name might be associated with the anonymous user on a "server" was because he was

---

[1]     At the hearing on the motion to quash, Nadhir's counsel stated the parties executed a stipulation that no records reflecting Zehia's personal information would be filed with the court. She claimed she did not attach the subpoenaed business records to her declaration in order to comply with the stipulation.

trying to "trace the source of the[] direct messages." S.M. averred she grew "increasingly uncomfortable with [Zehia]'s level of involvement" in trying to trace the source of the direct messages, Zehia provided overly-lengthy explanations about his conduct, and Zehia became so "intense" she stopped communicating with him. Copies of the screenshots S.M. received from Zehia were attached to the declaration.

In his declaration, Nadhir described the direct messages and friend requests he received on social media before and after his introduction to S.M. He also averred the conversations Zehia sent to S.M. were falsely attributed to him. He claimed to be the victim of a person who "intended to injure [his] reputation and damage [his] character by making it seem as though [he] disrespected [S.M.] and other women."

Zehia filed a reply and evidentiary objections to the declarations submitted with the opposition to the motion to quash. In pertinent part, he objected on authentication, foundation, hearsay, and best evidence grounds to Nadhir's counsel's averments purporting to describe the contents of the subpoenaed business records. Zehia also objected on authentication, foundation, and best evidence grounds to Nadhir's counsel's averment that she learned the locations associated with the pertinent IP addresses.

The trial court overruled the objections, in relevant part, and denied the motion to quash. It found the admissible evidence "demonstrate[d] a likelihood that [Zehia] purposefully directed activities at forum residents through his use of various [social media] accounts" and directed his conduct "at [Nadhir] specifically." It also ruled it would have denied the motion to quash even if it had sustained the objections to Nadhir's counsel's declaration "based on the other evidence submitted with the opposition."

6

Zehia filed a petition for writ of mandate requesting that we direct the trial court to vacate its order denying the motion to quash and enter a new order granting the motion to quash. After considering Nadhir's informal response and Zehia's reply thereto, we issued an order to show cause why the requested relief should not be granted. We have considered Nadhir's return and Zehia's reply to the return.

III

DISCUSSION

A

Before we discuss the trial court's ruling on the motion to quash, we must address a predicate evidentiary matter. Zehia contends the trial court abused its discretion in overruling his objections to the declaration of Nadhir's counsel. He does not identify specific objections he believes the court should have sustained or specific portions of the declaration that should have been stricken or disregarded. However, in general terms, he claims: (1) Nadhir's counsel lacked foundation to discuss the contents of the business records obtained from the social media company and service providers; and (2) the business records at issue were not authenticated. He further suggests there is no evidence, apart from the allegedly improper declaration of Nadhir's counsel, to support the trial court's determination that there was a likelihood Zehia "use[d the] various [social media] accounts" as described in Nadhir's complaint.

We need not reach the merits of Zehia's arguments because, as the trial court explained in its order denying the motion to quash, the court would have denied the motion to quash "based on the other evidence submitted with the opposition," even if it

7

had sustained the objections to the declaration of Nadhir's counsel. Further, substantial evidence—separate from Nadhir's counsel's declaration—supported the trial court's determination that there was a likelihood Zehia "use[d the] various [social media] accounts" in the manner described in the complaint. The averments in Nadhir's and S.M.'s declarations indicated there was close temporal proximity between S.M.'s request to Zehia for information about Nadhir and the sending of the tortious messages. S.M. also averred Zehia knew—and was concerned—his name might be connected to the anonymous user's "server." Finally, S.M. averred that Zehia exhibited such intensity in his alleged attempts to trace the source of the direct messages that she grew uncomfortable. Collectively, this constituted circumstantial, yet substantial, evidence supporting the trial court's finding. (*In re Leland D.* (1990) 223 Cal.App.3d 251, 258 ["Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom."].)

Based on the foregoing evidence, as well as the trial court's conclusion that it would have denied the motion to quash even if it had sustained the evidentiary objections, we conclude it was not reasonably probable the asserted errors affected the outcome of the motion. Therefore, any errors were harmless.[2] (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 ["[A]n erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result

_____

[2]   Zehia notes in passing there were "evidentiary defects" in S.M.'s declaration. In particular, he argues the declaration contained hearsay statements made by Zehia to S.M. However, these statements were not hearsay, as they were offered against the declarant in an action to which he is a party. (Evid. Code, § 1220.)

more favorable to the appealing party would have been reached in the absence of the error.' "].)

B

We now turn to the propriety of the order denying the motion to quash service of summons.  Zehia contends the exercise of personal jurisdiction over him is improper, and the trial court therefore should have granted the motion to quash, because he did not intentionally aim any conduct at California.  He claims the evidence establishes, at most, he knew his conduct would harm a "limited number of Californians"—an insufficient basis for personal jurisdiction.  By contrast, Nadhir contends Zehia's suit-related conduct established a connection between Zehia and California.  He argues the connection arose from Zehia's sending of targeted messages to California residents with the intent to disrupt their relationship and harm one of their reputations.

1

"California courts may exercise jurisdiction over a nonresident on any basis consistent with the federal or state Constitution.  (Code Civ. Proc., § 410.10.)  To comport with federal and state due process, California may only exercise jurisdiction when a defendant has sufficient minimum contacts with the state to satisfy ' "traditional notions of fair play and substantial justice." '  [Citations.]  Under the minimum contacts test, we examine the quality and nature of a defendant's action to determine whether requiring him to submit to jurisdiction in California is reasonable and fair." (*Strasner v. Touchstone Wireless Repair & Logistics, LP* (2016) 5 Cal.App.5th 215, 221 (*Strasner*).)

"Personal jurisdiction may be either general or specific." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445.) Here, we are concerned only with the issue of whether specific jurisdiction exists. "When determining whether specific jurisdiction exists, courts consider the ' "relationship among the defendant, the forum, and the litigation." ' [Citation.] A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum" ' [citation]; and (3) ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " ' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).)

" ' "When a defendant moves to quash service of process" [on jurisdictional grounds], "the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction." ' " (*Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 553 (*Jayone Foods*).) "The plaintiff must do more than merely allege jurisdictional facts. It must present evidence sufficient to justify a finding that California may properly exercise jurisdiction over the defendant." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110.) " ' "If the plaintiff meets this initial burden, then the defendant has the burden of demonstrating 'that the exercise of jurisdiction would be unreasonable.' " ' " (*Jayone Foods*, at p. 553.)

" 'When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence.' " (*Jayone Foods*, *supra*, 31 Cal.App.5th at p. 553.) "The ultimate question whether jurisdiction is fair and reasonable

10

under all of the circumstances, based on the facts which are undisputed and those resolved by the court in favor of the prevailing party, is a legal determination warranting our independent review."  (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.)

### 2

The parties agree a trio of decisions interpreting these jurisdictional principles governs the disposition of this case:  (1) *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*); (2) *Walden v. Fiore* (2014) 571 U.S. 277 (*Walden*); and (3) *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8 (*Burdick*).  Each of these decisions concerns, or at least discusses, jurisdictional principles as applied to intentional tort cases and/or allegations of wrongdoing on the Internet.  We address each decision in turn.

### a

In *Calder*, Shirley Jones, an actress who resided and worked in California, filed a libel action in California against a reporter and an editor based on a libelous article that was written about her and published in a nationally-syndicated newspaper.  (*Calder*, *supra*, 465 U.S. at pp. 784–786.)  The defendants moved to quash service of summons on grounds that they were Florida residents over whom California courts lacked personal jurisdiction.  (*Id.* at pp. 785–786, 789.)  The United States Supreme Court disagreed, noting the defendants used California sources for the article; the newspaper had its largest circulation in California; and the defendants knew Ms. Jones would suffer injury in California.  (*Id.* at pp. 788–790.)  "In sum, California [was] the focal point both of the story and of the harm suffered."  (*Id.* at p. 789.)  Therefore, jurisdiction over the

11

defendants was "proper in California based on the 'effects' of their Florida conduct in California." (*Ibid.*)

Our Supreme Court has described the "effects test" as a test governing whether a defendant in an intentional tort action has purposefully availed himself of the forum benefits. (*Pavlovich*, *supra*, 29 Cal.4th at p. 269.) " 'The purposeful availment inquiry ... focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.] Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], or of the "unilateral activity of another party or a third person." ' " (*Ibid.*)

After *Calder*, courts " 'struggled somewhat with [its] import, recognizing that the case [could not] stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction.' " (*Pavlovich*, *supra*, 29 Cal.4th at p. 270.) However, "most courts agree[d] that merely asserting that a defendant knew or should have known that his intentional acts would cause harm in the forum state is not enough to establish jurisdiction under the effects test." (*Id.* at pp. 270–271.)

In *Pavlovich*, for example, our Supreme Court concluded the effects test requires "intentional conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum." (*Pavlovich*, *supra*, 29 Cal.4th at pp. 271, 272–273.) Applying this standard, the court

12

held that a nonresident defendant did not expressly aim his tortious conduct at or intentionally target California merely by posting a California plaintiff's proprietary information on a publicly-accessible Internet website. (*Id.* at pp. 273–279.) As the court explained, the post was insufficient to establish express aiming because it was "accessible to any person with Internet access" in any forum, and there was no evidence in the record suggesting that the website "targeted California" or "any California resident ever visited" the website or downloaded the proprietary material. (*Id.* at pp. 273, 274.)

b

The United States Supreme Court elaborated on the extent to which forum states may exercise jurisdiction over nonresident defendants in *Walden*. In that case, an agent of the Drug Enforcement Agency (DEA) seized money in Georgia from airline passengers who were en route from Puerto Rico to Nevada and boarding a connecting flight in Georgia. (*Walden*, *supra*, 571 U.S. at pp. 279–281.) The travelers sued the agent in Nevada for illegal seizure of the funds and preparation of a false affidavit to show probable cause for forfeiture of the funds. (*Id.* at p. 281.) A lower court found there was jurisdiction in Nevada over the agent, a nonresident defendant, because he knew his conduct "would affect persons with a 'significant connection' to Nevada." (*Id.* at p. 282.)

The United States Supreme Court reversed. As the court explained, the defendant's "suit-related conduct" did not "create a substantial connection with the forum [s]tate" because the defendant questioned and searched the plaintiffs, seized the money, and drafted the probable cause affidavit in Georgia, and "never traveled to, conducted

13

activities within, contacted anyone in, or sent anything or anyone to Nevada." (*Walden*, *supra*, 571 U.S. at pp. 284, 288–289.) Although the plaintiffs "had Nevada connections," these were insufficient to confer jurisdiction over the defendants based on two related principles governing jurisdictional analyses. (*Id.* at p. 289.) "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum [s]tate," not contacts between the forum state and the plaintiff or a third party. (*Id.* at p. 284.) "Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there."[3] (*Id.* at p. 285.)

The *Walden* court explained that these principles apply to intentional tort actions and used *Calder* as an illustrative example. In so doing, it discussed the *Calder* opinion as follows: "The crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. [Citations.] Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number

---

3    The *Walden* court noted, however, that "a defendant's contacts with the forum [s]tate may be intertwined with his transactions or interactions with the plaintiff or other parties." (*Walden*, *supra*, 571 U.S. at p. 286; see also *David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 375 [cautioning that courts should not "mechanically apply *Walden*'s directive to distinguish a defendant's contacts 'with the forum [s]tate itself' from his contacts 'with persons who reside there.' "].)

14

of California citizens…. In this way, the 'effects' caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction [in *Calder*]." (*Walden*, *supra*, 571 U.S. at pp. 287–288, citations omitted.)

c

Recently, the California Court of Appeal applied these jurisdictional principles to a defamation action arising from a nonresident's public post on social media. In *Burdick*, a group of physicians, scientists, and entrepreneurs published blog entries questioning the safety and efficacy of a skin care product and, in response, a representative of the skin care company made a public social media post suggesting the bloggers had criminal histories. (*Burdick*, *supra*, 233 Cal.App.4th at pp. 14–15.) The bloggers filed suit in California against the representative, a resident of Illinois, and the trial court denied the defendant's motion to quash service of summons. (*Id.* at p. 16.)

The *Burdick* court reversed. (*Burdick*, *supra*, 233 Cal.App.4th at pp. 16, 30.) It reasoned the defendant's suit-related conduct—the public posting of an allegedly defamatory statement on social media—did not create a "substantial connection" with California. (*Id.* at p. 25.) As the court explained, the defendant published the post from Illinois and there was no evidence indicating the social media page "had a California audience," any significant number of the defendant's social media connections resided in California, or advertisements on the social media page targeted California. (*Ibid.*) On

15

these facts, the mere public posting on a social media page, with knowledge the plaintiff was in the forum state, was insufficient to confer jurisdiction over the defendant. (*Id.* at p. 25; see *Strasner*, *supra*, 5 Cal.App.5th at p. 232 [public posting of photograph on social media did not confer jurisdiction where there was no evidence it "specifically targeted California"].)

3

Under these precedents, our task is to determine whether Zehia's suit-related conduct created a substantial connection between Zehia and California. The suit-related conduct consists of three actions—(1) sending direct messages on social media to Nadhir questioning him about his relationship with S.M. and warning him not to proceed with the arranged introduction; (2) fabricating direct message and text message conversations that contained allegedly defamatory statements about Nadhir and impersonations of Nadhir; and (3) sending the fabricated conversations directly to S.M. on social media. It is undisputed that Zehia engaged in these actions, if at all, while located in Michigan.[4] Nevertheless, on the record before us, we conclude this conduct formed the necessary connection between Zehia and California to warrant the exercise of specific personal jurisdiction. We reach this conclusion for three reasons.

---

[4]     As noted, Zehia denies he authored the conversations he sent to S.M. However, the trial court rendered express findings, supported by substantial evidence, that there was a likelihood Zehia "use[d the] various [social media] accounts" in the manner described in Nadhir's complaint. Therefore, we must assume for purposes of this appeal that Zehia engaged in the alleged conduct.

First, Zehia transmitted the allegedly harassing statements directly to a California resident (Nadhir) and the allegedly fabricated conversations directly to another California resident (S.M.), with knowledge the recipients were California residents. Engaging in such targeted communications with forum residents has been recognized as one type of conduct that can establish a purposeful availment of the forum's benefits. (*Moncrief v. Clark* (2015) 238 Cal.App.4th 1000, 1006–1007 [purposeful availment satisfied based on calls and e-mails with forum-based attorney]; *In re Stevens* (2004) 119 Cal.App.4th 1228, 1234 ["Electronic communication may establish the necessary minimum contacts in a state to establish jurisdiction over a defendant."]; *Hall v. LaRonde* (1997) 56 Cal.App.4th 1342, 1344 ["[T]he use of electronic mail and the telephone by a party in another state may establish sufficient minimum contacts with California to support personal jurisdiction."]; cf. *Walden*, *supra*, 571 U.S. at p. 289 [no personal jurisdiction where defendant never "contacted anyone in, or sent anything or anyone to (forum)"].)

At a superficial level, the challenged conduct in the present case resembles the conduct undertaken by the nonresident defendant in *Burdick*, given that the defendants in both cases used an online social media platform to transmit allegedly defamatory statements. However, the similarities between the cases stop there. In *Burdick*, the defendant published a *public* social media post with no apparent California focus, which suggested he did not "intentionally target[] California as opposed to any other jurisdiction." (*Burdick*, *supra*, 233 Cal.App.4th at p. 25.) Here, by contrast, the evidence indicates Zehia sent *private* social media messages aimed exclusively at a California audience. Thus, unlike the *Burdick* defendant, the defendant in the present case had

17

contacts with the forum state that were not " 'random, fortuitous, or attenuated,' " or the product of unilateral activities of the plaintiff or third parties. (*Walden*, *supra*, 571 U.S. at p. 286.) Rather, they were the foreseeable results of his "intentional conduct." (*Ibid*.)

Second, the reputation based "effects" of the alleged defamation connected Zehia to California. Like the *Calder* case, the "reputational injury" caused by the allegedly fabricated and defamatory conversations "would not have occurred but for the fact that" they were received by a California audience. (*Walden*, *supra*, 571 U.S. at pp. 287, 288.) In other words, the alleged reputational injury to Nadhir occurred only when the defamatory statements were transmitted to California residents. "In this way, the 'effects' caused by the [statements]—*i.e.*, the injury to the plaintiff's reputation … connected [Zehia's] conduct to *California*, not just to a plaintiff who lived there."[5] (*Walden*, at p. 288.)

Third, the allegedly defamatory conversations had a distinct California focus. In the alleged conversations between the anonymous user and Zehia, for example, the anonymous user stated Nadhir ruined the reputation of Chaldean women in San Diego. Further, in the alleged conversations between the anonymous user and Nadhir, the individual purporting to be Nadhir discussed the arranged introduction between Nadhir

---

[5]    In *Calder*, the libelous article was read "by a large number of California citizens," which supported the exercise of personal jurisdiction over the defendants. (*Walden*, *supra*, 571 U.S. at p. 288.) Evidence of the article's readership was necessary to show the defendants' conduct was targeted at California because the article was published in a nationally-syndicated newspaper and therefore read both inside and outside California. Here, the strength of the connection between Zehia's suit-related conduct and the forum state does not turn on the number of California residents who viewed the tortious content because Zehia sent the content *exclusively* to California residents.

and S.M., which occurred in San Diego. As the *Walden* decision makes clear, defamatory content with a forum-related focus strengthens the connection between a nonresident tortfeasor's conduct and the forum. (*Walden*, *supra*, 571 U.S. at p. 288 [jurisdiction was proper in *Calder*, in part, because the article had "a California focus"].)

Based on the foregoing, we conclude Zehia's suit-related conduct established a substantial connection with California. By sending California-focused messages and conversations directly to California residents for the alleged purpose of interfering with the relationship of California residents and causing reputational injury in California, Zehia has "purposefully 'reach[ed] out beyond' [his s]tate and into" California. (*Walden*, *supra*, 571 U.S. at p. 285.) As such, he must " 'reasonably anticipate being haled into court there' to answer for" his conduct.[6] (*Calder*, *supra*, 465 U.S. at p. 790.)

---

[6]    Because we conclude the trial court correctly ruled it could exercise personal jurisdiction over Zehia based on his substantial connection with California, we do not address Nadhir's alternative argument that the exercise of personal jurisdiction was proper because Zehia engaged in " ' "exceptional" ' " conduct subject to " ' "special regulation" ' " in California. (*Hogue v. Hogue* (2017) 16 Cal.App.5th 833, 838, 839.)

19

IV

DISPOSITION

The petition is denied.  Nadhir is entitled to costs on appeal.

McCONNELL, P.J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.