Toshiba Glob. Commerce Sols., Inc. v. Smart & Final Stores LLC, 2020 NCBC 95.

STATE OF NORTH CAROLINA

DURHAM COUNTY

TOSHIBA GLOBAL COMMERCE
SOLUTIONS, INC.,

Plaintiff,

v.

SMART & FINAL STORES LLC,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 2559

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

1. This action arises out of a services agreement between Toshiba Global Commerce Solutions, Inc. ("Toshiba") and Smart & Final Stores LLC ("Smart & Final"). Toshiba brought suit, claiming that Smart & Final breached and then repudiated the agreement. Smart & Final now contends that the Court lacks personal jurisdiction over it and moves to dismiss the complaint on that basis. (ECF No. 9.) For the following reasons, the Court **DENIES** the motion.

*Robinson, Bradshaw & Hinson, P.A., by Edward F. Hennessey, IV, Matthew Sawchak, Erik R. Zimmerman, and Benjamin C. DeCelle, for Plaintiff Toshiba Global Commerce Solutions, Inc.*

*Ellis & Winters LLP, by Paul K. Sun, Jr. and Kelly Margolis Dagger, for Defendant Smart & Final Stores LLC.*

Conrad, Judge.

I.
DISCUSSION

2. When a defendant challenges personal jurisdiction, "the Court may decide the matter based on affidavits." *Capitala Grp., LLC v. Columbus Advisory Grp. LTD*, 2018 NCBC LEXIS 183, at *3 (N.C. Super. Ct. Dec. 3, 2018) (citation and quotation

marks omitted). "If both parties submit dueling affidavits, the trial judge must determine the weight and sufficiency of the evidence presented in the affidavits much as a juror." *Id.* (citation and quotation marks omitted). The burden is on the plaintiff to establish personal jurisdiction by a preponderance of the evidence. *See id.*

3. The parties have submitted dueling affidavits and additional exhibits in support of and in opposition to Smart & Final's motion. The Court held a hearing on October 29, 2020. Having considered all relevant matters, the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law.

## A. Findings of Fact

4. Based in Durham, North Carolina, Toshiba makes and sells point-of-sale products used by retailers—for example, scanners, monitors, and related checkout devices. (*See* Margosian Aff. ¶¶ 3–5, ECF No. 21.3.) It also offers support services for its products and those made by others. (*See* Margosian Aff. ¶¶ 4, 6.)

5. Smart & Final is a California company that operates a chain of warehouse-style grocery stores in the western United States. (*See* 1st Kumar Aff. ¶¶ 3, 4, 6, ECF No. 9.1.) Until recently, one of its subsidiaries operated restaurant supply and wholesale food stores in the same region. (*See* 1st Kumar Aff. ¶ 5.)

6. In late 2017, Smart & Final began searching for a service provider to maintain and repair point-of-sale equipment at its stores. (*See* Wong Aff. ¶¶ 3, 4, ECF No. 9.2.) One of the vendors it contacted was Toshiba. (*See* Wong Aff. ¶ 4.) The parties promptly signed a nondisclosure agreement, notable only because it lists

Toshiba's North Carolina address at the top.  (*See* White Aff. ¶ 4 & Ex. A, ECF No. 21.4.)  Over the next few months, Toshiba sent pitch materials and a formal proposal for a mix of products and services.  Toshiba touted its technology (hardware and software), national presence (a fleet of technician vans coupled with a network of stocking locations to house inventory), and support infrastructure (a central repair depot and an "expert staff of trained personnel . . . at our corporate HQ" in North Carolina).  (*See, e.g.*, White Aff. Ex. C at 5, 7, 10–11, 21–22; White Aff. Ex. E at 13.)  Ultimately, though, Smart & Final went with a different vendor.  (*See* Wong Aff. ¶ 4.)

7.      Evidently, that relationship didn't work out, and soon Smart & Final was looking for a new vendor.  It reached out to Toshiba a second time and requested another proposal.  (*See* 1st Kumar Aff. ¶¶ 11–13; White Aff. ¶ 14.)  Most of the negotiations took place via e-mail and telephone between Smart & Final representatives in California and Toshiba representatives in California and Texas.  (*See* 1st Kumar Aff. ¶¶ 15–17; White Aff. ¶ 14.)  There was also at least one in-person meeting at Smart & Final's California headquarters.  (*See* 1st Kumar Aff. ¶ 15.)

8.      This time, the negotiations were fruitful, producing a services agreement in March 2019.  (*See* Def.'s Ex. 4, ECF No. 9.4 ["Servs. Agrmt."].)  In a nutshell, Toshiba agreed to provide maintenance and repair services for point-of-sale equipment at all Smart & Final stores for three years.  (*See* Servs. Agrmt. Attach. A.)  Smart & Final could renew the agreement for additional one-year terms with written notice to Toshiba's North Carolina headquarters.  (*See* Servs. Agrmt. §§ 15, 23.)    A

choice-of-law provision states that New York law governs the agreement. (*See* Servs. Agrmt. § 26.)

9. Smart & Final selected two service options: "On-Site Repair" and "Advanced Exchange Plus." (Servs. Agrmt. § 5, Attach. C; *see also* 2d Kumar Aff. ¶ 6, ECF No. 29.1.) On-Site Repair means just what it says: a Toshiba technician would travel to a given store and try to repair defective equipment on site. (*See* Servs. Agrmt. § 5, Attach. C.) Advanced Exchange Plus, on the other hand, is a replacement service. This option calls for the technician to replace the defective part with a working unit taken from inventory called seed stock. (*See* Servs. Agrmt. § 5.) Although Smart & Final could have chosen to own and maintain the seed stock itself, it shifted that burden to Toshiba. (*See* Servs. Agrmt. § 5 ("*Advanced Exchange Service*" versus "*Advanced Exchange Plus Service*").) Toshiba also took responsibility for installing replacement parts and for "the return of the [defective] Product back to [its] depot." (Servs. Agrmt. Attach. C.)[1]

10. Both service options are geared toward addressing problems as they arise. Determined "to operate [its] stores without interruption," Smart & Final put a premium on speed. (2d Kumar Aff. ¶ 6.) The agreement specifies response times and performance goals typically based on same-day or next-day service. (*See* Servs. Agrmt. Attachs. A, B; 2d Kumar Aff. ¶ 11.) Along with making its technicians

---

[1] Toshiba also offered a "Depot Repair" option, which requires the customer to remove the defective product, ship it to a Toshiba facility for repair, and then reinstall the part after repair. (Servs. Agrmt. § 5.) Smart & Final did not select that option. (*See* 2d Kumar Aff. ¶ 10; Servs. Agrmt. Attach. C.)

available seven days a week, Toshiba agreed to "provide an infrastructure and support structure to meet" its obligations. (Servs. Agrmt. Attach. C.)

11. These requirements are reflected in the price. Attachment A details the prices for repair and replacement services for dozens of products, based in part on estimates of the amount of seed stock needed, the expected response time, and the number of anticipated service calls. It also states various pricing assumptions, including that Toshiba would own the seed stock and "image/configure units during the receive and repair process at our Depot." (Servs. Agrmt. Attach. A.) For the Advanced Exchange Plus option, the price sheet assumes that a "technician will meet [the] part on-site that is shipped from the Toshiba depot," noting that the replacement "part for [a] failed unit [would be] available under Next Business Day support." (Servs. Agrmt. Attach. A.)

12. Although the agreement doesn't say so, the "depot" is part of Toshiba's "Tricenter operations hub" in North Carolina. (*See, e.g.*, Glendenning Aff. ¶¶ 2–6, 9, ECF No. 21.5; White Aff. Ex. E at 13.) This is where Toshiba managed the seed stock and repaired failed equipment throughout its relationship with Smart & Final. (*See* Glendenning Aff. ¶¶ 9, 10, 12, 13.) Before the "go live date" for the services agreement, employees at the depot estimated the seed stock needed to get started, procured it (because Smart & Final used non-Toshiba equipment), and then shipped it to field technicians and stocking locations. (Glendenning Aff. ¶ 10.) As time went by, the depot received and repaired equipment that technicians could not fix on site. (*See* Glendenning Aff. ¶¶ 11, 12.) The depot then returned these repaired items to

the seed stock or, if a part was beyond repair, replenished the stock with new equipment. (*See* Glendenning Aff. ¶ 13; *see also* 2d Kumar Aff. ¶ 14.)

13. Over the course of their relationship, Toshiba handled about 7,200 repair tickets for Smart & Final. (*See* Glendenning Aff. ¶ 15.) Some involved purely on-site repairs. (*See* Glendenning Aff. ¶ 16.) Many others required support from Toshiba's depot in North Carolina. The depot recorded more than 4,200 shipments of parts to replenish inventory and more than 2,600 repairs for parts removed from Smart & Final stores—about seven percent of the repairs and replenishments performed for all Toshiba customers. (*See* Glendenning Aff. ¶¶ 18–21.)

14. Less than a year into their relationship, the parties split. Toshiba alleges that the equipment covered by the agreement failed at rates far higher than Smart & Final predicted during negotiations, triggering hefty overage fees. (*See* Compl. ¶ 30, ECF No. 2.) As alleged, Smart & Final refused to pay and then terminated the agreement without cause in April 2020, more than two years before its scheduled expiration. (*See* Compl. ¶¶ 33, 46.) Toshiba sued for breach of contract and related claims. (*See* Compl. ¶ 73.)

## B. Conclusions of Law

15. Personal jurisdiction refers to the Court's authority "to assert judicial power over the parties and bind them by its adjudication." *Capitala Grp.*, 2018 NCBC LEXIS 183, at *8 (citation and quotation marks omitted). The "primary focus" of the personal jurisdiction inquiry "is the defendant's relationship to the forum State." *Bristol-Meyers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779 (2017).

16.     In North Carolina, determining whether personal jurisdiction exists is a "two-step analysis."  *Beem USA LLLP v. Grax Consulting LLC*, 373 N.C. 297, 302, 838 S.E.2d 158, 161 (2020).  Jurisdiction must be authorized by the State's long-arm statute, N.C.G.S. § 1-75.4, and consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *See Beem USA*, 373 N.C. at 302, 838 S.E.2d at 161.  In most cases, the analysis collapses into one inquiry because the North Carolina Supreme Court has broadly construed the long-arm statute "to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process."  *Id.* (citation and quotation marks omitted); *see also Cambridge Homes of N.C. LP v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412, 670 S.E.2d 290, 295 (2008); *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671, 541 S.E.2d 733, 736 (2001).

17.     Nearly all the parties' briefing deals with step two's due process analysis. (*See* Br. in Supp. 13–29, ECF No. 10; Opp'n 12–23, ECF No. 21; Reply Br. 2–14, ECF No. 30.)  But Smart & Final also challenges step one on the ground that the complaint fails to meet threshold pleading requirements for statutory jurisdiction.  (*See* Br. in Supp. 10–12.)  The Court begins with that argument.

*1. Long-Arm Statute*

18.     The complaint does not refer to the long-arm statute or expressly allege personal jurisdiction under any of its subsections.  Smart & Final contends, as a result, that Toshiba has not done enough to plead a statutory basis for jurisdiction, obviating the need to consider due process limitations.  (*See* Br. in Supp. 10–11.)

19. This argument overstates the pertinent pleading burden. Jurisdiction may exist even when the plaintiff says nothing about the long-arm statute in the complaint. *See, e.g., N.C. Farm Bureau Mut. Ins. Co. v. Holt*, 154 N.C. App. 156, 160, 574 S.E.2d 6, 9 (2002). "The failure to plead the particulars of jurisdiction is not fatal to the claim so long as the facts alleged permit the inference of jurisdiction under the statute." *Williams v. Inst. for Computational Stud. at Colo. State Univ.*, 85 N.C. App. 421, 428, 355 S.E.2d 177, 182 (1987).

20. In its response brief, Toshiba points to section 1-75.4(5), which broadly confers jurisdiction on any action that

> a. Arises out of a promise, made anywhere to the plaintiff . . . by the defendant to perform services within this State or to pay for services to be performed in this State by the plaintiff; or
>
> b. Arises out of . . . services actually performed for the defendant by the plaintiff within this State if such performance within this State was authorized or ratified by the defendant; or
>
> . . . .
>
> d. Relates to goods, documents of title, or other things of value shipped from this State by the plaintiff to the defendant on his order or direction; or
>
> e. Relates to goods, documents of title, or other things of value actually received by the plaintiff in this State from the defendant through a carrier without regard to where delivery to the carrier occurred.

N.C.G.S. § 1-75.4(5). The complaint alleges that Smart & Final solicited maintenance and repair services from Toshiba, a North Carolina company. (*See* Compl. ¶¶ 1, 9.) It also incorporates by reference the contract at issue, which describes the services that Toshiba would perform. (*See* Compl. ¶ 13.) For pleading purposes, that is enough to support an inference of jurisdiction under section 1-75.4(5). *See Skinner v.*

*Preferred Credit*, 361 N.C. 114, 120, 638 S.E.2d 203, 209 (2006) ("Essentially, this section of the long-arm statute reaches defendants who engage in commercial transactions with residents of this state." (citation omitted)).

21. The remaining arguments relate to proof, rather than pleading. Smart & Final contends that Toshiba has not carried its burden to prove statutory or constitutional jurisdiction. Because the statutory arguments simply repeat the constitutional arguments, (*see* Reply Br. 2), the Court turns to step two.

## 2. Due Process

22. The Due Process Clause requires that a defendant "have certain minimum contacts" with this State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Sometimes, a defendant's contacts "are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011) (citation and quotation marks omitted). In that case, the courts of the forum State have general jurisdiction "to hear any and all claims against" the defendant. *Id.* The parties agree that there is no basis for general jurisdiction here. (*See* Br. in Supp. 13–14; Opp'n 12–14.)

23. More commonly, a "nonresident defendant has situational, rather than systematic, contacts with the forum State." *Lunsford v. ViaOne Servs., LLC*, 2020 NCBC LEXIS 127, at *9 (N.C. Super. Ct. Oct. 28, 2020). Jurisdiction in such cases depends on the "relationship among the defendant, the forum, and the litigation."

*Daimler AG v. Bauman*, 571 U.S. 117, 133 (2014) (citation and quotation marks omitted); *see also Beem USA*, 373 N.C. at 303, 838 S.E.2d at 162. There must be a nexus between the forum and the underlying controversy such that "the suit 'arises out of or relates to the defendant's contacts with the forum.'" *Goodyear*, 564 U.S. at 923–24 (alterations omitted) (quoting *Helicopteros Nacionales De Colombia, S. A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)); *see also Skinner*, 361 N.C. at 122, 638 S.E.2d at 210. This is known as "specific or case-linked jurisdiction." *Goodyear*, 564 U.S. at 919 (citation omitted).

24. The analysis for specific jurisdiction "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Jurisdiction cannot be based on "a defendant's 'random, fortuitous, or attenuated' contacts with the forum state." *Beem USA*, 373 N.C. at 303, 838 S.E.2d at 162 (quoting *Walden*, 571 U.S. at 286). Rather, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citation omitted). A "crucial factor" is foreseeability—that is, whether the defendant's contacts with the forum are such that it should "reasonably anticipate being haled into court there." *Beem USA*, 373 N.C. at 303, 838 S.E.2d at 162 (citations and quotation marks omitted).

25. This test is met when the suit is based on a contract that "has a substantial connection with this State." *Beem USA*, 373 N.C. at 304, 838 S.E.2d at 163 (quoting

*Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 367, 348 S.E.2d 782, 786 (1986)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). When a defendant "has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Burger King*, 471 U.S. at 476 (citation and quotation marks omitted). Put another way, the defendant's "activities are shielded by 'the benefits and protections' of the forum's laws" such that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* To determine whether a contract has a substantial connection with a State, the Court must consider prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing. *See id.* at 479.

26. Weighing all the evidence, the Court concludes that the services agreement has a substantial connection with North Carolina. Smart & Final initiated contact with a resident of this State and created a continuing relationship involving services that were performed both within and outside North Carolina. Accordingly, Smart & Final has purposefully availed itself of the privilege of conducting business in North Carolina.

27. To start, Smart & Final twice contacted Toshiba to solicit its services. This is a "critical factor." *Cambridge Homes*, 194 N.C. App. at 413, 670 S.E.2d at 296 (quoting *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 698, 611 S.E.2d 179, 185 (2005)). And for good reason. When a nonresident makes

first contact and solicits business from a forum resident, it tends to show purposeful availment.[2]

28.     It makes little difference that Smart & Final contacted Toshiba employees based elsewhere.  That was true in *Burger King* too.  There, the defendant (a Michigander) first contacted Burger King (based in Florida) through its district office in Michigan.  471 U.S. at 466.  Even so, the Court held that the defendant "deliberately 'reached out beyond' Michigan" and "most certainly knew that he was affiliating himself with an enterprise based primarily in Florida."  *Id.* at 479, 480 (citation, alteration, and quotation marks omitted).

29.     Smart & Final was well aware when it contacted representatives of Toshiba that it was soliciting business from a North Carolina-based entity.  The nondisclosure agreement that preceded negotiations has Toshiba's address right at the top.  There are also repeated references to North Carolina in Toshiba's pitch materials and proposal as well as in the services agreement itself, which requires all notices to go

---

[2] This principle is a mainstay of North Carolina and federal precedent.  *See, e.g.*, *Brown v. Artisan 2510, Inc.*, No. COA13-868, 2014 N.C. App. LEXIS 292, at *9 (N.C. Ct. App. Mar. 18, 2014); *Bryant v. AP Indus.*, No. COA12-1456, 2013 N.C. App. LEXIS 862, at *15–16 (N.C. Ct. App. Aug. 20, 2013); *Banc of Am. Sec.*, 169 N.C. App. at 698, 611 S.E.2d at 185; *Inspirational Network, Inc. v. Combs*, 131 N.C. App. 231, 241, 506 S.E.2d 754, 761 (1998); *Climatological Consulting Corp. v. Trattner*, 105 N.C. App. 669, 674, 414 S.E.2d 382, 384–85 (1992); *CFA Med., Inc. v. Burkhalter*, 95 N.C. App. 391, 395, 383 S.E.2d 214, 216 (1989); *see also, e.g.*, *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 562 (4th Cir. 2014) (collecting cases); *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295 n.17 (4th Cir. 2009); *Madison Consulting Grp. v. South Carolina*, 752 F.2d 1193, 1202–03 (7th Cir. 1985); *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 671–72 (D. Md. 2009); *Competitive Strategies Grp., Ltd. v. IP Commc'ns Corp.*, No. 00-CV-0057, 2000 U.S. Dist. LEXIS 3198, at *7–8 (N.D. Ill. Mar. 13, 2000); *Salem Radio Representatives, Inc. v. Can Tel Mkt. Support Grp.*, No. 3:99-CV-2048, 1999 U.S. Dist. LEXIS 17962, at *7 (N.D. Tex. Nov. 16, 1999); *Berndorf Belt Sys., Inc. v. Ascona Food Grp. (Can.) Ltd.*, No. 98-C-1055, 1998 U.S. Dist. LEXIS 19141, at *22 (N.D. Ill. Dec. 3, 1998).

to Toshiba's Durham headquarters. Furthermore, unlike the defendant in *Burger King*, Smart & Final is a large, sophisticated company deeply familiar with the market for point-of-sale products and services. (*See* White Aff. ¶¶ 3, 7, 13, 14, 16; 1st Kumar Aff. ¶¶ 10–13.) At no point has Smart & Final claimed surprise to find that Toshiba is based in North Carolina.

30. Indeed, the services that Smart & Final solicited were performed inside and outside North Carolina. Smart & Final erroneously contends that "[n]othing in the Agreement suggests that any work would be performed in North Carolina." (Br. in Supp. 21.) Naturally, all on-site repairs were expected to take place at stores in the western United States. But the agreement also tasked Toshiba with maintaining seed stock and handling shipping of parts to and from its repair depot. (*See* Servs. Agrmt. Attach. C.) The price list, for example, was based in part on an assumption that Toshiba would "image/configure units during the receive and repair process at our Depot." (Servs. Agrmt. Attach. A.) And for some replacement services, the agreement called for a technician to "meet [the] part on-site that is shipped from the Toshiba depot." (Servs. Agrmt. Attach. A.) Context makes clear that these are references to the repair depot at Toshiba's North Carolina headquarters.

31. The parties' course of performance confirms as much. In less than a year, Toshiba recorded thousands of shipments from its North Carolina base to maintain seed stock and replenish inventory, along with more than 2,600 repairs of parts taken from Smart & Final stores. (*See* Glendenning Aff. ¶¶ 18–21.) This was not only a substantial part of the services performed for Smart & Final but also an appreciable

part of the repair and replenishment services that Toshiba performed as a whole. (*See* Glendenning Aff. ¶¶ 20, 21.)

32.     Smart & Final responds that Toshiba could have handled offsite services somewhere else.  It also contends that parts removed from a store became Toshiba's property so that there were no shipments of Smart & Final property to or from North Carolina.  (*See* Reply Br. 13–14.)  Neither argument is persuasive.  Smart & Final had the option to keep its seed stock in house so that Toshiba would be responsible only for labor at affected stores.  Instead, Smart & Final put the burden on Toshiba to create and maintain the seed stock and to provide the infrastructure needed for same-day and next-day services.  The agreement—and the prices proposed by Toshiba—assume that much of that work would take place at the depot in North Carolina.  Put simply, Smart & Final sought and bargained for comprehensive repair and support services that required continuous and extensive coordination between Toshiba's technicians and its headquarters.  It was foreseeable and expected that Toshiba would perform a substantial part of the services at its facilities in this State.

33.     Two other points bear mention.  First, it is undisputed that Smart & Final did not come to North Carolina or perform any services here.  But "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King*, 471 U.S. at 476; *see also Tom Togs*, 318 N.C. at 368, 348 S.E.2d at 787 ("Defendant, however, argues strongly that personal jurisdiction is improper because it took no action *in* North Carolina.  Lack

of action by defendant *in* a jurisdiction is not now fatal to the exercise of long-arm jurisdiction." (citations omitted)).

34. Second, the agreement has a New York choice-of-law provision. This factor does not favor the exercise of jurisdiction, but neither does it weigh strongly against jurisdiction given that neither party is organized under New York law or based in New York. *See Tejal Vyas, LLC v. Carriage Park LP*, 166 N.C. App. 34, 41, 600 S.E.2d 881, 887 (2004) ("[C]hoice of law clauses are not determinative of personal jurisdiction . . . .").

35. In short, Smart & Final initiated contact with Toshiba, a corporation based in North Carolina. It bargained for substantial services to be performed inside North Carolina, and Toshiba actually performed a substantial portion of its obligations in the State. Accordingly, the Court concludes that Smart & Final's "connections with North Carolina relating to the contract satisf[y] the minimum contacts inquiry and establish[ ] the existence of specific jurisdiction." *Beem USA*, 373 N.C. at 304, 838 S.E.2d at 163 (citation omitted); *see also Tom Togs*, 318 N.C. at 368, 348 S.E.2d at 787; *Nat'l Util. Rev., LLC v. Care Ctrs., Inc.*, 200 N.C. App. 301, 305, 683 S.E.2d 460, 464–65 (2009); *Banc of Am. Sec.*, 169 N.C. App. at 696–701, 611 S.E.2d at 184–87; *Kath v. H.D.A. Ent., Inc.*, 120 N.C. App. 264, 266–67, 461 S.E.2d 778, 779–80 (1995).

36. Finally, in some rare cases, it may be unreasonable or inconvenient to exercise jurisdiction even when the defendant has the requisite minimum contacts with the forum. Smart & Final has not made that argument here. Thus, given the agreement's substantial relationship with this State, the Court may appropriately

exercise jurisdiction over Smart & Final without offending due process. *See Burger King*, 471 U.S. at 487.

## II.
## CONCLUSION

37. For all these reasons, the Court **DENIES** Smart & Final's motion to dismiss for lack of personal jurisdiction.

38. Consistent with its September 18, 2020 Order, (ECF No. 17), the Court **ORDERS** that the parties shall conduct their case management meeting no later than January 4, 2021 and shall submit a joint case management report and proposed case management order fifteen days thereafter. *See* Business Court Rules 9.1, 9.2. In view of the intervening holidays, if additional time is needed, the parties may request a reasonable extension.

**SO ORDERED**, this the 23rd day of December, 2020.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases