(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WALDEN *v.* FIORE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–574.   Argued November 4, 2013—Decided February 25, 2014

Petitioner Walden, a Georgia police officer working as a deputized Drug Enforcement Administration agent at a Georgia airport, searched respondents and seized a large amount of cash.  Respondents allege that after they returned to their Nevada residence, petitioner helped draft a false probable cause affidavit in support of the funds' forfeiture and forwarded it to a United States Attorney's Office in Georgia. In the end, no forfeiture complaint was filed, and respondents' funds were returned.  Respondents filed a tort suit against petitioner in Federal District Court in Nevada.  The District Court dismissed the suit, finding that the Georgia search and seizure did not establish a basis to exercise personal jurisdiction in Nevada.  The Ninth Circuit reversed, holding that the District Court could properly exercise jurisdiction because petitioner had submitted the false probable cause affidavit with the knowledge that it would affect persons with significant Nevada connections.

*Held:* The District Court lacked personal jurisdiction over petitioner. Pp. 5–14.

   (a) The Fourteenth Amendment's Due Process Clause constrains a State's authority to bind a nonresident defendant to a judgment of its courts, *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 291, and requires that the nonresident have "certain minimum contacts" with the forum State, *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316.  The inquiry into the "minimum contacts" necessary to create specific jurisdiction focuses "on the relationship among the defendant, the forum, and the litigation."  *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775.  For a State to exercise jurisdiction consistent with due process, that relationship must arise out of contacts that the "defendant *himself*" creates with the forum, *Burger King*

*Corp.* v. *Rudzewicz*, 471 U. S. 462, 475, and must be analyzed with regard to the defendant's contacts with the forum itself, not with persons residing there, see, *e.g.*, *International Shoe, supra*, at 319. The plaintiff cannot be the only link between the defendant and the forum. These same principles apply when intentional torts are involved. See *Calder* v. *Jones*, 465 U. S. 783, 788–789. Pp. 5–10.

(b) Petitioner lacks the "minimal contacts" with Nevada that are a prerequisite to the exercise of jurisdiction over him. No part of petitioner's course of conduct occurred in Nevada, and he formed no jurisdictionally relevant contacts with that forum. The Ninth Circuit reached its contrary conclusion by improperly shifting the analytical focus from petitioner's contacts with the forum to his contacts with respondents, obscuring the reality that none of petitioner's challenged conduct had anything to do with Nevada itself. Respondents emphasize that they suffered the "injury" caused by the delayed return of their funds while residing in Nevada, but *Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. The proper question is whether the defendant's conduct connects him to the forum in a meaningful way: Here, respondents' claimed injury does not evince such a connection. The injury occurred in Nevada simply because that is where respondents chose to be when they desired to use the seized funds. Other possible contacts noted by the Ninth Circuit—that respondents' Nevada attorney contacted petitioner in Georgia, that cash seized in Georgia originated in Nevada, and that funds were returned to respondents in Nevada—are ultimately unavailing. Pp. 11–14.

688 F. 3d 558, reversed.

THOMAS, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–574

ANTHONY WALDEN, PETITIONER *v.* GINA FIORE
ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 25, 2014]

JUSTICE THOMAS delivered the opinion of the Court.

This case asks us to decide whether a court in Nevada may exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada. Because the defendant had no other contacts with Nevada, and because a plaintiff's contacts with the forum State cannot be "decisive in determining whether the defendant's due process rights are violated," *Rush* v. *Savchuk*, 444 U. S. 320, 332 (1980), we hold that the court in Nevada may not exercise personal jurisdiction under these circumstances.

I

Petitioner Anthony Walden serves as a police officer for the city of Covington, Georgia. In August 2006, petitioner was working at the Atlanta Hartsfield-Jackson Airport as a deputized agent of the Drug Enforcement Administration (DEA). As part of a task force, petitioner conducted investigative stops and other law enforcement functions in support of the DEA's airport drug interdiction program.

On August 8, 2006, Transportation Security Admin-

istration agents searched respondents Gina Fiore and
Keith Gipson and their carry-on bags at the San Juan
airport in Puerto Rico. They found almost $97,000 in
cash. Fiore explained to DEA agents in San Juan that she
and Gipson had been gambling at a casino known as the
El San Juan, and that they had residences in both Cali-
fornia and Nevada (though they provided only California
identification). After respondents were cleared for depar-
ture, a law enforcement official at the San Juan airport
notified petitioner's task force in Atlanta that respondents
had boarded a plane for Atlanta, where they planned to
catch a connecting flight to Las Vegas, Nevada.

When respondents arrived in Atlanta, petitioner and
another DEA agent approached them at the departure
gate for their flight to Las Vegas. In response to petition-
er's questioning, Fiore explained that she and Gipson were
professional gamblers. Respondents maintained that the
cash they were carrying was their gambling "'bank'" and
winnings. App. 15, 24. After using a drug-sniffing dog to
perform a sniff test, petitioner seized the cash.[1] Petitioner
advised respondents that their funds would be returned if
they later proved a legitimate source for the cash. Re-
spondents then boarded their plane.

After respondents departed, petitioner moved the cash
to a secure location and the matter was forwarded to DEA
headquarters. The next day, petitioner received a phone
call from respondents' attorney in Nevada seeking return
of the funds. On two occasions over the next month, peti-
tioner also received documentation from the attorney
regarding the legitimacy of the funds.

At some point after petitioner seized the cash, he helped
draft an affidavit to show probable cause for forfeiture of

––––––––––

[1] Respondents allege that the sniff test was "at best, inconclusive,"
and there is no indication in the pleadings that drugs or drug residue
were ever found on or with the cash. App. 21.

the funds and forwarded that affidavit to a United States Attorney's Office in Georgia.[2]  According to respondents, the affidavit was false and misleading because petitioner misrepresented the encounter at the airport and omitted exculpatory information regarding the lack of drug evidence and the legitimate source of the funds.  In the end, no forfeiture complaint was filed, and the DEA returned the funds to respondents in March 2007.

Respondents filed suit against petitioner in the United States District Court for the District of Nevada, seeking money damages under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971).  Respondents alleged that petitioner violated their Fourth Amendment rights by (1) seizing the cash without probable cause; (2) keeping the money after concluding it did not come from drug-related activity; (3) drafting and forwarding a probable cause affidavit to support a forfeiture action while knowing the affidavit contained false statements; (4) willfully seeking forfeiture while withholding exculpatory information; and (5) withholding that exculpatory information from the United States Attorney's Office.

The District Court granted petitioner's motion to dismiss.  Relying on this Court's decision in *Calder* v. *Jones*, 465 U. S. 783 (1984), the court determined that petitioner's search of respondents and his seizure of the cash in Georgia did not establish a basis to exercise personal jurisdiction in Nevada.  The court concluded that even if petitioner caused harm to respondents in Nevada while knowing they lived in Nevada, that fact alone did not confer jurisdiction.  Because the court dismissed the complaint for lack of personal jurisdiction, it did not determine

---

[2] The alleged affidavit is not in the record.  Because this case comes to us at the motion-to-dismiss stage, we take respondents' factual allegations as true, including their allegations regarding the existence and content of the affidavit.

whether venue was proper.

On appeal, a divided panel of the United States Court of Appeals for the Ninth Circuit reversed. The Court of Appeals assumed the District Court had correctly determined that petitioner's search and seizure in Georgia could not support exercise of jurisdiction in Nevada. The court held, however, that the District Court could properly exercise jurisdiction over "the false probable cause affidavit aspect of the case." 688 F. 3d 558, 577 (2011). According to the Court of Appeals, petitioner "expressly aimed" his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a "significant connection" to Nevada.[3] *Id.,* at 581. After determining that the delay in returning the funds to respondents caused them "foreseeable harm" in Nevada and that the exercise of personal jurisdiction over petitioner was otherwise reasonable, the court found the District Court's exercise of personal jurisdiction to be proper.[4] *Id.,* at 582, 585. The Ninth Circuit denied rehearing en banc, with eight judges, in two separate opinions, dissenting. *Id.,* at 562, 568.

We granted certiorari to decide whether due process permits a Nevada court to exercise jurisdiction over petitioner. 568 U. S. ___ (2013). We hold that it does not and

———————

[3] The allegations in the complaint suggested to the Court of Appeals that petitioner "definitely knew, at some point *after* the seizure but *before* providing the alleged false probable cause affidavit, that [respondents] had a significant connection to Nevada." 688 F. 3d, at 578.

[4] Judge Ikuta dissented. In her view, the "false affidavit/forfeiture proceeding aspect" over which the majority found jurisdiction proper was not raised as a separate claim in the complaint, and she found it "doubtful that such a constitutional tort even exists." *Id.,* at 593. After the court denied rehearing en banc, the majority explained in a postscript that it viewed the filing of the false affidavit, which effected a "continued seizure" of the funds, as a separate Fourth Amendment violation. *Id.,* at 588–589. Petitioner does not dispute that reading here.

therefore reverse.[5]

## II

## A

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG* v. *Bauman*, 571 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 6). This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. Rule of Civ. Proc. 4(k)(1)(A). Here, Nevada has authorized its courts to exercise jurisdiction over persons "on any basis not inconsistent with . . . the Constitution of the United States." Nev. Rev. Stat. §14.065 (2011). Thus, in order to determine whether the Federal District Court in this case was authorized to exercise jurisdiction over petitioner, we ask whether the exercise of jurisdiction "comports with the limits imposed by federal due process" on the State of Nevada. *Daimler*, *supra,* at \_\_\_ (slip op., at 6).

## B

## 1

The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 291 (1980). Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have "certain minimum contacts . . . such that the maintenance of the suit does not

–––––––––

[5] We also granted certiorari on the question whether Nevada is a proper venue for the suit under 28 U. S. C. §1391(b)(2). Because we resolve the case on jurisdictional grounds, we do not decide whether venue was proper in Nevada.

offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316 (1945) (quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940)).

This case addresses the "minimum contacts" necessary to create specific jurisdiction.[6]  The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984) (quoting *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977)).  For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.  Two related aspects of this necessary relationship are relevant in this case.

First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 475 (1985).  Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties.  See *World-Wide Volkswagen Corp.*, *supra*, at 291–292.  We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.  See *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 417 (1984) ("[The] unilateral

―――――――

[6] "Specific" or "case-linked" jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy'" (*i.e.*, an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation"). *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___, ___ (2011) (slip op., at 2).  This is in contrast to "general" or "all purpose" jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.,* domicile).  Respondents rely on specific jurisdiction only.

activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction"). We have thus rejected a plaintiff's argument that a Florida court could exercise personal jurisdiction over a trustee in Delaware based solely on the contacts of the trust's settlor, who was domiciled in Florida and had executed powers of appointment there. *Hanson* v. *Denckla,* 357 U. S. 235, 253–254 (1958). We have likewise held that Oklahoma courts could not exercise personal jurisdiction over an automobile distributor that supplies New York, New Jersey, and Connecticut dealers based only on an automobile purchaser's act of driving it on Oklahoma highways. *World-Wide Volkswagen Corp., supra,* at 298. Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be "decisive in determining whether the defendant's due process rights are violated." *Rush,* 444 U. S., at 332.

Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. See, *e.g., International Shoe, supra,* at 319 (Due process "does not contemplate that a state may make binding a judgment *in personam* against an individual . . . with which the state has no contacts, ties, or relations"); *Hanson, supra,* at 251 ("However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him"). Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully "reach[ed] out beyond" their State and into another by, for example, entering a contractual relationship that "envisioned continuing and wide-reaching contacts" in the forum State, *Burger King, supra,* at 479–480, or by circulating maga-

zines to "deliberately exploi[t]" a market in the forum State, *Keeton*, *supra,* at 781. And although physical presence in the forum is not a prerequisite to jurisdiction, *Burger King*, *supra*, at 476, physical entry into the State— either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact. See, *e.g., Keeton*, *supra*, at 773–774.

But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. See *Burger King*, *supra*, at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot"); *Kulko* v. *Superior Court of Cal., City and County of San Francisco*, 436 U. S. 84, 93 (1978) (declining to "find personal jurisdiction in a State . . . merely because [the plaintiff in a child support action] was residing there"). To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. See *Rush*, *supra*, at 332 ("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum. The requirements of *International Shoe*, however, must be met as to each defendant over whom a state court exercises jurisdiction"). Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State. *Burger King*, 471 U. S., at 475 (internal quotation marks omitted).

2

These same principles apply when intentional torts are involved. In that context, it is likewise insufficient to rely on a defendant's "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of a plaintiff. *Ibid.* (same). A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.

*Calder* v. *Jones*, 465 U. S. 783, illustrates the application of these principles. In *Calder*, a California actress brought a libel suit in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. The plaintiff's libel claims were based on an article written and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000.

We held that California's assertion of jurisdiction over the defendants was consistent with due process. Although we recognized that the defendants' activities "focus[ed]" on the plaintiff, our jurisdictional inquiry "focuse[d] on 'the relationship among the defendant, the forum, and the litigation.'" *Id.*, at 788 (quoting *Shaffer*, 433 U. S., at 204). Specifically, we examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story.

We found those forum contacts to be ample: The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff in that State. 465 U. S., at 788–789. "In sum, California [wa]s the focal point both of the story and of the harm suffered."

*Id.,* at 789. Jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Ibid.*

The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. See Restatement (Second) of Torts §577, Comment *b* (1976); see also *ibid.* ("[R]eputation is the estimation in which one's character is held by his neighbors or associates"). Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, see *id.*, §558, the defendants' intentional tort actually occurred *in* California. *Keeton*, 465 U. S., at 777 ("The tort of libel is generally held to occur wherever the offending material is circulated"). In this way, the "effects" caused by the defendants' article—*i.e.,* the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.[7]

———————

[7]The defendants in *Calder* argued that no contacts they had with California were sufficiently purposeful because their employer was responsible for circulation of the article. See *Calder* v. *Jones*, 465 U. S. 783, 789 (1984). We rejected that argument. Even though the defendants did not circulate the article themselves, they "expressly aimed" "their intentional, and allegedly tortious, actions" at California because they knew the National Enquirer "ha[d] its largest circulation" in

### III

Applying the foregoing principles, we conclude that petitioner lacks the "minimal contacts" with Nevada that are a prerequisite to the exercise of jurisdiction over him. *Hanson*, 357 U. S., at 251. It is undisputed that no part of petitioner's course of conduct occurred in Nevada. Petitioner approached, questioned, and searched respondents, and seized the cash at issue, in the Atlanta airport. It is alleged that petitioner later helped draft a "false probable cause affidavit" in Georgia and forwarded that affidavit to a United States Attorney's Office in Georgia to support a potential action for forfeiture of the seized funds. 688 F. 3d, at 563. Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—petitioner formed no jurisdictionally relevant contacts with Nevada.

The Court of Appeals reached a contrary conclusion by shifting the analytical focus from petitioner's contacts with the forum to his contacts with respondents. See *Rush*, 444 U. S., at 332. Rather than assessing petitioner's own contacts with Nevada, the Court of Appeals looked to petitioner's knowledge of respondents' "strong forum connections." 688 F. 3d, at 577–579, 581. In the court's view, that knowledge, combined with its conclusion that respondents suffered foreseeable harm in Nevada, satisfied the "minimum contacts" inquiry.[8] *Id.,* at 582.

This approach to the "minimum contacts" analysis

_____

California, and that the article would "have a potentially devastating impact" there. *Id.*, at 789–790.

[8] Respondents propose a substantially similar analysis. They suggest that "a defendant creates sufficient minimum contacts with a forum when he (1) intentionally targets (2) a known resident of the forum (3) for imposition of an injury (4) to be suffered by the plaintiff while she is residing in the forum state." Brief for Respondents 26–27.

impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections "decisive" in the jurisdictional analysis. See *Rush, supra,* at 332. It also obscures the reality that none of petitioner's challenged conduct had anything to do with Nevada itself.

Relying on *Calder*, respondents emphasize that they suffered the "injury" caused by petitioner's allegedly tortious conduct (*i.e.,* the delayed return of their gambling funds) while they were residing in the forum. Brief for Respondents 14. This emphasis is likewise misplaced. As previously noted, *Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

Respondents' claimed injury does not evince a connection between petitioner and Nevada. Even if we consider the continuation of the seizure in Georgia to be a distinct injury, it is not the sort of effect that is tethered to Nevada in any meaningful way. Respondents (and only respondents) lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where respondents chose to be at a time when they desired to use the funds seized by petitioner. Respondents would have experienced this same lack of access in California, Mississippi, or wherever else they might have traveled and found themselves wanting more money than

they had. Unlike the broad publication of the forum-focused story in *Calder*, the effects of petitioner's conduct on respondents are not connected to the forum State in a way that makes those effects a proper basis for jurisdiction.[9]

The Court of Appeals pointed to other possible contacts with Nevada, each ultimately unavailing. Respondents' Nevada attorney contacted petitioner in Georgia, but that is precisely the sort of "unilateral activity" of a third party that "cannot satisfy the requirement of contact with the forum State." *Hanson*, 357 U. S., at 253. Respondents allege that some of the cash seized in Georgia "originated" in Nevada, but that attenuated connection was not created by petitioner, and the cash was in Georgia, not Nevada, when petitioner seized it. Finally, the funds were eventually returned to respondents in Nevada, but petitioner had nothing to do with that return (indeed, it seems likely that it was respondents' unilateral decision to have their funds sent to Nevada).

\*    \*    \*

Well-established principles of personal jurisdiction are sufficient to decide this case. The proper focus of the

―――――――――

[9] Respondents warn that if we decide petitioner lacks minimum contacts in this case, it will bring about unfairness in cases where intentional torts are committed via the Internet or other electronic means (*e.g.,* fraudulent access of financial accounts or "phishing" schemes). As an initial matter, we reiterate that the "minimum contacts" inquiry principally protects the liberty of the nonresident defendant, not the interests of the plaintiff. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., 286, 291–292 (1980). In any event, this case does not present the very different questions whether and how a defendant's virtual "presence" and conduct translate into "contacts" with a particular State. To the contrary, there is no question where the conduct giving rise to this litigation took place: Petitioner seized physical cash from respondents in the Atlanta airport, and he later drafted and forwarded an affidavit in Georgia. We leave questions about virtual contacts for another day.

"minimum contacts" inquiry in intentional-tort cases is
"'the relationship among the defendant, the forum, and
the litigation.'"  *Calder*, 465 U. S., at 788.  And it is the
defendant, not the plaintiff or third parties, who must
create contacts with the forum State.  In this case, the
application of those principles is clear: Petitioner's rele-
vant conduct occurred entirely in Georgia, and the mere
fact that his conduct affected plaintiffs with connections
to the forum State does not suffice to authorize jurisdic-
tion.  We therefore reverse the judgment of the Court of
Appeals.

                                         *It is so ordered.*