Filed 1/15/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PARAFI DIGITAL OPPORTUNITIES LP et al., Plaintiffs and Appellants, v. MIKHAIL EGOROV, Defendant and Respondent. | A168960 (San Francisco County Super. Ct. No. CGC-22-602668) |

Plaintiffs ParaFi Digital Opportunities LP (ParaFi), Framework Ventures, L.P. (Framework), and 1kx LP (1kx) appeal from an order granting defendant Mikhail Egorov's motion to quash for lack of personal jurisdiction. Because Egorov's relevant contacts with California were instigated by plaintiffs, we agree that there is insufficient basis for exercising specific jurisdiction over Egorov and affirm.

**BACKGROUND**[1]

This dispute arises from Egorov's cancellation of plaintiffs' investment in Curve, a decentralized cryptocurrency trading platform developed by

---

[1] Our background comes from the evidence submitted in support of and in opposition to Egorov's motion to quash. We also cite to the operative amended complaint filed on April 21, 2023, but take no position on the legal or factual sufficiency of plaintiffs' claims. (*Kroopf v. Guffey* (1986) 183 Cal.App.3d 1351, 1360 ["a motion to quash service is strictly limited to the question of jurisdiction over the defendant" and " 'the *merits* of the complaint [are] not within the scope of the issues raised by the motion' "]; *Mihlon v.*

Egorov.  Plaintiffs assert claims for fraud, conversion, and various statutory violations based on Egorov's alleged representations and conduct during the parties' negotiation of an investment agreement and related shareholders' agreement (together, the agreements).

## A.  Curve

Curve is an Ethereum blockchain-based cryptocurrency exchange that allows users to exchange cryptocurrencies directly, without a centralized intermediary facilitating the trades.  Egorov began developing Curve in 2019 when he was living in Washington state but working at NuCypher, a San Francisco-based security and encryption platform he co-founded.  In July 2019, Egorov formed Swiss Stake GmbH (Swiss Stake) to develop and deploy the Curve platform, which it did in January 2020.  Swiss Stake is a limited liability company incorporated under Swiss law and based in the Canton of Zug, Switzerland, "known as an epicenter of the blockchain industry."  In March 2020, Egorov received his Swiss residency card and "moved permanently to Switzerland shortly thereafter."  Egorov currently resides in Zug, Switzerland.

After Curve's initial launch, Swiss Stake retained "limited control over some ministerial and administrative features of the Curve platform," but Egorov's goal was to fully decentralize Curve by distributing Swiss Stake's control to a community of individuals and entities known as a "Decentralized Autonomous Organization" or, here, as "the Curve DAO."  Egorov planned to create and distribute digital governance tokens, i.e., cryptocurrency, called "CRV."  These CRV tokens would give holders "the limited ability to control

_Superior Court_ (1985) 169 Cal.App.3d 703, 710 [although an unverified complaint "has no evidentiary value," " 'it defines the cause of action' " and relevant facts].)

2

the ministerial and administrative features of Curve," thereby accomplishing the desired decentralization.

## B. Plaintiffs and Friends of Curve

Plaintiffs claim to be "among the most prominent investment funds in the DeFi [decentralized finance] space." ParaFi and Framework are Delaware limited partnerships that were founded in San Francisco in 2018 and 2019, respectively, and operated in California through at least August 2020. 1kx is a Cayman Islands exempted limited partnership, which does not allege any California-based operations.

According to plaintiffs, when Curve first launched in January 2020, it "saw limited success."[2] Christopher Heymann of 1kx had met Egorov in 2017 at a technology conference. After reading about Curve in early 2020, Heymann discussed with his partner Lasse Clausen the possibility of 1kx investing in Curve. On February 11, 2020,[3] Clausen asked Egorov via the Telegram messaging platform, "are you raising money for Curve?" Egorov responded that he "did a small raise" already and would "be able to finance [by him]self after" but would "tell if more is needed."[4]

On April 15, Egorov messaged Heymann that he was "raising another, little round" of financing for Curve, which was "still pre-DAO," and asked, "Would you guys be interested?" Heymann responded, "Yes, that would be

---

[2] By contrast, in their initial complaint, plaintiffs alleged that Curve "launched in January 2020 to great success."

[3] Subsequent dates take place in 2020 unless otherwise specified.

[4] In early 2020, Swiss Stake received an investment from three individuals not parties to this appeal in exchange for Swiss Stake equity and CRV tokens. The term sheet documenting this investment, which had been prepared by Egorov's Swiss attorneys, would become the template for the investment agreement entered into by plaintiffs and Egorov.

interesting." 1kx also suggested that Egorov discuss a possible investment from ParaFi and Framework, which Clausen "believed" would help Curve "to grow rapidly."

Thus, on April 22, Clausen created a group message on Telegram called "ParaFi & Curve," with 1kx, ParaFi's founder Benjamin Forman, and Egorov.[5]  ParaFi was "excited about the opportunity" to help grow the Curve platform and subsequently provided Egorov with "time, money, and other resources" in reliance on Egorov's promise that ParaFi would be able to invest in Curve.

On April 28, ParaFi created "Curve/ParaFi," a separate Telegram group message with its core group and Egorov, where they discussed the terms of a potential investment.  In this group message, ParaFi asked:  "[E]xactly, the term sheet.  [A]ny sense when that will be ready?"  Egorov responded, "Let me send what I have," and on May 15, sent the term sheet that had been entered into as part of the earlier investment round.  The draft term sheet provided that the agreements "shall be governed by Swiss law and shall provide for the jurisdiction of the ordinary courts of Zug."

ParaFi agreed "to take the lead" on preparing the agreements and to "work with outside counsel to get the docs in order."

On June 8, Framework created another group message called "friends of Curve," which included its co-founder Vance Spencer, along with ParaFi's

---

[5] With respect to plaintiffs, we use the entity's name unless an individual's name is needed for clarity.  ParaFi's "core team" was based in San Francisco and included Santiago Roel Santos, Kevin Yedid-Botton, Anjan Vinod, and Forman.  Specifically, Forman and Santos were living and working in San Francisco throughout the course of negotiations with Egorov and relatedly received and signed legal documents in California and initiated financial transactions from California.

core group, Egorov, and other nonparty investors, where they discussed Curve and an investment in Swiss Stake.

On June 10, ParaFi sent "the latest draft of the investment agreement from counsel" and asked the "friends of Curve" group members to "please review" and respond with "any comments/questions." In response, Egorov stated that he would not "be signing before our lawyers chat a bit," and the parties agreed to an initial draft review by Egorov's attorneys. Over the next few days, ParaFi and Framework repeatedly messaged Egorov urging the finalization of the agreements.

On June 24, Egorov circulated revised drafts of the agreements to the friends of Curve group. On June 26, the parties joined a call "to hash out last minor points," and on June 28, plaintiffs, along with seven other investors, signed the agreements.[6] The executed agreements provided that any disputes arising out of or related to the agreements would be "exclusively" resolved in Zug in accordance with "the substantive laws of Switzerland."

## C. Swiss Litigation

On July 3, "pursuant to the Investment Agreement," each plaintiff transmitted $308,411.18 worth of USDC to Swiss Stake's cryptocurrency wallet address. However, on August 4, Egorov emailed plaintiffs and the other investors cancelling the investment round and offering to "refund everyone who wasn't an investor in the company before this round." Egorov represented that "the deadline for closing all the docs for the round was set to

---

[6] Forman and Spencer signed the agreements on behalf of ParaFi and Framework, respectively, while in California, Clausen signed on behalf of 1kx, and Egorov signed on behalf of Swiss Stake and as an individual "Founder."

5

[expire on] July 31st." But "despite several reminders," Egorov was missing "some documents and 1 payment."[7]

The next day, plaintiffs responded through counsel, indicating that the "agreements are binding obligations" and that plaintiffs "are not willing to accept a 'reimbursement.'" Ultimately, plaintiffs "sought to protect [their] legal rights" and litigation ensued.

Plaintiffs obtained an emergency injunction in Swiss court shortly after the purported cancellation in August. The injunction prohibited Swiss Stake from distributing more than 67 percent of any tokens, cryptocurrency, or other digital asset in Curve. However, an anonymous Twitter (now X) user launched the Curve DAO despite the injunction, resulting in the distribution of CRV tokens, including a distribution to Egorov but not to plaintiffs. Plaintiffs filed another request for emergency interim relief, which the Swiss court initially granted but subsequently lifted after Egorov and Swiss Stake filed an objection. Plaintiffs appealed, which the high court of the Canton of Zug ultimately dismissed.

On October 11, 2021, plaintiffs initiated "the main proceedings" against Egorov and Swiss Stake in Swiss court, which, as of June 2023, were "still at a relatively early stage."

**D. California Litigation**

Over one year later, on October 28, 2022, plaintiffs initiated this action in California, asserting claims for fraud and unfair competition against Egorov; the 2023 amended complaint added claims for violation of California securities law, conversion, and misappropriation of trade secrets.

---

[7] Egorov concedes that he was mistaken about the missing payment, which had been received "roughly half a day before [Egorov] sent the cancellation email" but "still well after the Long Stop Date" of July 31st.

6

According to the amended complaint, Egorov engaged in a "multi-faceted scheme to defraud Plaintiffs over a six-month period," by falsely promising plaintiffs a stake in Curve to leverage plaintiffs' "networks, reputation, and other assistance to generate interest and legitimize Curve," without any intent to distribute CRV tokens, and related voting rights, to plaintiffs. Plaintiffs allege that Egorov fraudulently induced them to sign the investment and shareholders' agreements and used the Swiss law clauses to facilitate the alleged fraud by shielding Egorov from United States jurisdiction.

Egorov moved to quash service of the summons and amended complaint for lack of personal jurisdiction and concurrently moved to dismiss the amended complaint for forum non conveniens.[8] The court granted Egorov's motion to quash and dropped the forum non conveniens motion as "moot."

The court explained that plaintiffs failed to show either general or specific jurisdiction. With respect to specific jurisdiction, the court determined that "the parties contemplated that Switzerland would be the 'base of operations'" notwithstanding plaintiffs' attempt to distance themselves from the agreements' forum selection clauses by asserting only tort claims. Thus, looking at the parties' entire litigation posture, including plaintiffs' Swiss suit, the court concluded that plaintiffs' decision "to only plead tort claims in this action is not dispositive." However, the court also noted that choice-of-law and forum selection clauses, " 'standing alone,' are not dispositive" either. "In sum," the court decided that "based on the parties' negotiations, interactions, and plaintiff[s'] prior Swiss suit, [Egorov] did not

[8] Egorov had previously moved to quash and dismiss the initial complaint, but the parties stipulated to allow plaintiffs' leave to file the amended complaint with a proposed briefing schedule for Egorov's motions, which the court adopted.

7

purposefully avail himself to the benefits and protections of the laws of California such that he had 'fair warning' " of being sued in California.

The court also denied plaintiffs' request for jurisdictional discovery, explaining that Egorov "has not lived in California since 2018 and plaintiffs' desire to test [Egorov's] credibility based on statements that are not necessarily contradictory" was insufficient to justify discovery.

Plaintiffs timely appealed.

## DISCUSSION

On appeal, plaintiffs challenge the trial court's finding that it did not have personal jurisdiction over Egorov and its denial of plaintiffs' request to conduct jurisdictional discovery. We set forth the applicable standard of review before turning to the substantive law.

When a defendant moves to quash service of process, the plaintiff bears the initial burden of demonstrating facts justifying the exercise of jurisdiction. (*Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 552, citing *Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 553.) To carry this burden, the plaintiff must do more than merely allege facts; the plaintiff " 'must present evidence sufficient to justify a finding that California may properly exercise jurisdiction over the defendant.' " (*Zehia*, at p. 552, quoting *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110 (*Automobile Antitrust Cases*).) If the plaintiff satisfies the initial burden, then the defendant has the burden of demonstrating that the exercise of jurisdiction would be unreasonable. (*Zehia*, at p. 552, citing *Jayone Foods, Inc.*, at p. 553)

When the facts are undisputed, we independently review the record to determine whether the exercise of " 'jurisdiction is fair and reasonable under all of the circumstances.' " (*Zehia v. Superior Court*, *supra*, 45 Cal.App.5th at

8

p. 552, quoting *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.) But when there is conflicting evidence, "the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*).) And even when the facts are conflicting, "we review independently the trial court's conclusions as to the legal significance of the facts." (*F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 794.)

Here, the material facts are not disputed and, as to those facts, our review is de novo.[9] (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 980 (*Anglo Irish Bank*); see also *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 394 ["the parties may contest each other's characterization of the facts even though the evidence presented by each side is not in conflict"].)

## I. General Principles of Personal Jurisdiction

California courts may exercise personal jurisdiction "on any basis not inconsistent with" the California or United States Constitutions. (Code Civ. Proc., § 410.10; *Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1061.) Federal constitutional principles require that a nonresident defendant have sufficient " ' "minimum contacts" ' " with California to justify

---

[9] The "only arguably 'disputed' fact" before the trial court was whether Egorov subjectively believed that ParaFi's and Framework's Silicon Valley connections were necessary or valuable to Curve. In this regard, we presume the court found plaintiffs' declarations vague and contradicted by Egorov's declaration that plaintiffs' California connections "were unimportant," findings which are supported by substantial evidence. (*Kroopf v. Guffey, supra*, 183 Cal.App.3d at p. 1359 ["whenever conflicting evidence is presented in affidavits on a motion to quash, it is presumed the trial court resolved such conflicts against the appellant and in support of its order"].)

the exercise of personal jurisdiction.  (*Swenberg v. Dmarcian, Inc.* (2021) 68 Cal.App.5th 280, 291 (*Swenberg*), quoting *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103, 112 (*Taylor-Rush*).)  "The concept of minimum contacts embraces two types of jurisdiction—general and specific." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 536.)  We address only specific jurisdiction because plaintiffs do not argue that Egorov is subject to general jurisdiction on appeal, nor did they raise the argument below.

"In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" (*Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 264, quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 919.)  Generally, three requirements must be satisfied for a California court to exercise specific jurisdiction over a nonresident defendant: (1) the defendant must purposefully avail themselves of forum benefits; (2) the controversy must be related to or arise out of the defendant's forum contacts; and (3) the assertion of personal jurisdiction must comport with fair play and substantial justice.  (*Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 978, citing *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).)

In evaluating purposeful availment, the United States Supreme Court has pronounced the requisite forum contacts using a variety of language, including a defendant who " 'purposefully directed' his or her activities at forum residents," " 'purposefully derived benefit' from forum activities," or " ' "purposefully avail[ed himself or herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections

10

of its laws." ' " (*Vons*, *supra*, 14 Cal.4th at p. 446, citing *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472, 473, 475–476.)  The United States Supreme Court's use of disjunctive language and its rejection of "mechanical" formulas "suggests that the above formulations describe *alternative*, but not mutually exclusive, tests for purposeful availment." (*Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1568 (*Gilmore Bank*).)

## II.  Purposeful Availment

Plaintiffs argue the trial court misapplied the purposeful availment standard and the undisputed material facts require a finding of jurisdiction. We disagree.

To start, plaintiffs' criticisms of the trial court's reasons for its ruling are misguided.  Plaintiffs argue the court failed to apply "the test or tests *most conducive* to exercising jurisdiction," which plaintiffs assert is the forum benefits and/or effects test, "given the tort claims asserted here."  But California courts generally eschew attempts to "read into purposeful availment law an inflexible dichotomy between tort and contract cases," as plaintiffs try to do in this appeal. (*Gilmore Bank*, *supra*, 223 Cal.App.4th at pp. 1569, 1571.)  Moreover, on appeal from an order granting a motion to quash, the court's ruling "must be affirmed even if ' "given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*T.A.W. Performance, LLC v. Brembo, S.p.A.* (2020) 53 Cal.App.5th 632, 643–644, quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

Based on our independent review, the record fails to show that Egorov purposefully availed himself of California benefits, directed conduct at

11

California, or otherwise developed a substantial connection with California. Rather, it appears that plaintiffs—venture capital firms incorporated in Delaware and the Cayman Islands—sought out investment opportunities in "groundbreaking DeFi-focused start-ups" and solicited Egorov for the chance to invest in Curve due to its "strength and potential." To the extent Egorov reached out to any party, he reached out to 1kx, which does not assert any California connections. In turn, 1kx introduced Egorov to ParaFi and Framework, who instigated subsequent communications. Thus, ParaFi and Framework's investment resulted from 1kx's recommendation and plaintiffs' coordinated communications rather than any efforts initiated by Egorov to do business in California. "[T]he plaintiff[s] cannot be the only link between the defendant and the forum," nor can the " 'unilateral activity' of a plaintiff" support the exercise of jurisdiction, even "when intentional torts are involved." (*Walden v. Fiore* (2014) 571 U.S. 277, 285–286 (*Walden*).)

Other than accepting plaintiffs' request to invest in Curve, there is no indication that Egorov opened the "little round" of fundraising to California residents generally or otherwise solicited California investors. Egorov never visited California to market Curve, to seek out investors, or even to meet with plaintiffs during negotiations.

Further, plaintiffs were "excited about the opportunity to collaborate with Egorov and help get the Curve DAO off the ground." Plaintiffs provided Egorov with allegedly valuable information to help ensure Curve's success in order to gain a return on their own investments. Accordingly, plaintiffs' alleged sharing of trade secrets and other confidential information was part and parcel of their attempted investment and in furtherance of their desire to acquire a "material ownership stake in Curve," as opposed to some independent Egorov-initiated transaction giving rise to jurisdiction. (Cf. *West*

12

*Corp. v. Superior Court* (2004) 116 Cal.App.4th 1167, 1176–1177 [finding purposeful availment based on defendant "upselling" a product to a California resident who reached out to the defendant because the "upselling" was "a separate transaction" initiated by defendant].)  Thus, plaintiffs' evidence fails to demonstrate purposeful availment.

Although our conclusion does not depend on the application of a specific test, we briefly address plaintiffs' arguments regarding the "three accepted tests for purposeful availment:  the 'benefits' test, the 'effects' test, and the 'contracts' test."

## A.  The Forum Benefits

Under the forum benefits test, purposeful availment may be found where the defendant purposefully "benefits in the forum by reaching out to forum residents to create an ongoing" relationship.  (*Vons, supra*, 14 Cal.4th at p. 449; *Gilmore Bank, supra*, 223 Cal.App.4th at p. 1570; see also *Anglo Irish Bank, supra*, 165 Cal.App.4th at pp. 978–979.)

Plaintiffs argue that Egorov "induced California companies to send him funds from California," but the record reflects that Egorov sought to avoid engaging in economic activities in California.  Egorov moved from California to Washington State in January 2018, before beginning to develop Curve in 2019, before creating Swiss Stake, and before the parties began negotiations in early 2020.  Egorov intentionally incorporated Swiss Stake under Swiss law "because of the favorable economic and regulatory environment in Switzerland for blockchain and cryptocurrency," which the parties openly discussed during negotiations.  On this record, Egorov received no "benefit" from California in the formation of Swiss Stake or initial development of Curve.

Additionally, the "funds" plaintiffs transmitted to Egorov were cryptocurrency sent to Swiss Stake's digital wallet. While ParaFi and Framework initiated the transactions from California, they are both Delaware corporations and do not state where the United States currency underlying the USDC originated. (See, e.g., *Gilmore Bank*, *supra*, 223 Cal.App.4th at p. 1572 [finding purposeful availment based on, inter alia, the foreign defendant's exchange of money with California-based accounts].) Regardless, merely receiving payment from California investors is not sufficient to demonstrate purposeful availment. (See, e.g., *Elkman v. National States Ins. Co.* (2009) 173 Cal.App.4th 1305, 1321 [foreign insurance company did not purposeful avail itself of California benefits "merely by accepting premium payments from California" and "processing and paying claims submitted by its insureds for services rendered in this state"].) And any alleged misuse of the investment funds occurred in Switzerland, where Egorov and Swiss Stake were located.

Plaintiffs offer several cases purportedly finding a basis for specific jurisdiction on "similar facts," but we find these cases factually distinguishable and highlight Egorov's lack of sufficient connection to California. For example, in *Checker Motors Corp. v. Superior Court* (1993) 13 Cal.App.4th 1007, 1018, the court found that the foreign defendants' "latticework of contacts [with California] is more than enough to satisfy due process." There, however, the foreign defendants "sought out" and "initiated" communications with a California insurance company "in California, knowing it was a California company." (*Id.* at pp. 1017–1018.) They "solicited and negotiated a substantial investment" from the insurer, "made the California insurer the sole limited partner in [defendants'] out-of-state partnership," and then terminated the insurer's partnership interest when the state placed

14

it under a conservatorship, thereby depriving the conservator and California policyholders of their share of any "future profits." (*Id.* at pp. 1010–1011.) Here, plaintiffs' record does not show that Egorov solicited business from California, or even from ParaFi and Framework, and while the parties messaged each other during negotiations, the messages were initiated by plaintiffs and relate to a single transaction, with the only relationship to California being ParaFi's and Framework's presence in the state.

In *Anglo Irish Bank*, *supra*, 165 Cal.App.4th at page 984, the court found purposeful availment based on "individuals who visited California" on behalf of the foreign defendant "for the purpose of engaging in economic activity with California residents." The individuals successfully secured investments from "9 or 10" of the "10 or 11 potential clients" they visited in California in March 2000. (*Id.* at p. 975.) The individuals returned to California in November 2000 for related conferences and again in May 2001 to meet with at least one potential investor. (*Id.* at p. 976.) By contrast, Egorov made no trips to California to meet with plaintiffs, and any visits in 2020 were unrelated to Curve or Swiss Stake.[10]

---

[10] Plaintiffs also cite without explanation, *Swenberg*, *supra*, 68 Cal.App.5th at pages 289, 298, an opinion from Division Two of this court that found purposeful availment based on the foreign defendant—the founder of a Dutch entity referred to as dmarcian EU—"publicly presenting himself as a leader of dmarcian, a company headquartered in California, having dmarcian EU's web address automatically route to dmarcian's Web site, administered in California, and receiving prospective customers directed to dmarcian EU by a dmarcian employee in California." Plaintiffs assert no equivalent forum-based activity here, and plaintiffs knew Egorov to be a foreign national who developed Curve while living in Washington State before establishing legal residency in Switzerland, where he established Swiss Stake.

## B. The Effects Test

In the intentional tort context, the United States Supreme Court has utilized an effects test. (*Pavlovich, supra*, 29 Cal.4th at pp. 269–270; *Gilmore Bank, supra*, 223 Cal.App.4th at pp. 1569–1570.) Under the effects test, specific personal jurisdiction " 'may be exercised over a defendant who has caused an effect in the forum state by an act or omission occurring elsewhere.' " (*Swenberg, supra*, 68 Cal.App.5th at p. 292, quoting *Taylor-Rush, supra*, 217 Cal.App.3d at p. 112.) However, like the forum benefits test, the effects test "requires express aiming at the *forum* (not necessarily at the plaintiff)." (*Gilmore Bank*, at p. 1570; *Swenberg*, at p. 292 ["But there must be evidence the nonresident defendant *intentionally targeted* his or her conduct *at the forum state* and not just at a plaintiff who lives" there], first italics added.) Thus, under the effects test, specific jurisdiction lies "*only* if [the defendant's] suit-related conduct creates a *substantial connection* with that state"; it is not sufficient that a defendant "targeted conduct at a plaintiff he knows resides in the forum state." (*David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 373; accord, *Walden, supra*, 571 U.S. at p. 290 ["The proper question" under the effects test "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way"].)

Here, plaintiffs argue that ParaFi and Framework were injured in California and that Egorov "knew (or should have known) that ParaFi and Framework would feel the consequences of his conduct in California." But "mere injury to a forum resident is not a sufficient connection to the forum." (*Walden, supra*, 571 U.S. at p. 290.) And "[s]imply directing conduct at a plaintiff knowing that she has significant California connections does not

16

satisfy the minimum contacts inquiry." (*David L. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 374; see also *Pavlovich*, *supra*, 29 Cal.4th at pp. 270–271 ["most courts agree that merely asserting that a defendant knew or should have known that his intentional acts would cause harm in the forum state is not enough to establish jurisdiction under the effects test"].)

To the same end, Egorov's subjective beliefs about the value of ParaFi and Framework's California connections are not determinative. To begin, substantial evidence supports the trial court's finding that Egorov found "such connections unimportant." Egorov declared that he "never thought of ParaFi or Framework as being especially prominent or well-respected investment firms," and that he "thought little or not at all about ParaFi's connections to California (if any), and such connections were not [his] reason to consider ParaFi as an investor." Even if "contradicted by overwhelming evidence," as plaintiffs contend, Egorov's declaration constitutes substantial evidence sufficient to support the decision of the trial court. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 ["A single witness's testimony may constitute substantial evidence to support a finding"].)

Regardless of Egorov's subjective beliefs regarding the value of an investment from ParaFi and Framework, courts look to Egorov's conduct, not the underlying motivation, in evaluating purposeful availment. (*Asahi Metal Industry Co., Ltd. v. Superior Court* (1987) 480 U.S. 102, 112 ["The 'substantial connection,' [citations], between the defendant the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant*"].) Thus, even assuming Egorov valued ParaFi and Framework's California connections, plaintiffs' relationship with Egorov arose out of 1kx's suggestion and plaintiffs' outreach, not because of any actions Egorov directed at California.

Further, we disagree with plaintiffs in their assertion that *Taylor-Rush* "is on all fours" with the circumstances here. In *Taylor-Rush*, *supra*, 217 Cal.App.3d at page 113, the defendants "approached" the plaintiff "in California" regarding their purchase of plaintiff's California corporation, and the parties signed the relevant agreements in California. (*Id.* at p. 108; see also *Doe v. Damron* (2021) 70 Cal.App.5th 684, 691 [citing *Taylor-Rush*, at p. 111 for the proposition that the requirements for specific jurisdiction "are met when a tort claim is based on the actions of a defendant who traveled to a state and, while there, injured the plaintiff"].) In contrast, the record here reveals that Egorov's only visits to California during the relevant time were unconnected to Curve or plaintiffs. Thus, Egorov's only relationship to California is based on ParaFi and Framework's incidental presence in the state, which is insufficient to establish purposeful availment. (*Walden*, *supra*, 571 U.S. at p. 285 ["But the plaintiff cannot be the only link between the defendant and the forum"].)

## C. The Contracts Test

Under the contracts test, courts look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to evaluate purposeful availment. (*Burger King Corp. v. Rudzewicz*, *supra*, 471 U.S. at p. 479.) Here, the agreements require the resolution of disputes in Switzerland and the application of Swiss law. While plaintiffs assign nefarious intent to the forum selection and choice of law provisions, "the Due Process Clause 'gives a degree of predictability to the legal system that *allows* potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " (*Id.* at p. 472, italics added.) Notably, ParaFi prepared the agreements and could

have removed or modified these provisions; instead, plaintiffs expanded the Swiss forum clause to be "exclusive[]." Thus, both the "terms of the contract" and "contemplated future consequences" reinforce the finding that Egorov could not reasonably foresee litigation in California. (*Id.* at pp. 479, 482.)

While Egorov was aware ParaFi and Framework were based in California during their negotiations, it was plaintiffs who initiated these communications, and the ordinary " 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.' " (*Peterson v. Kennedy* (9th Cir. 1985) 771 F.2d 1244, 1262, citing *Floyd J. Harkness Co. v. Amezcua* (1976) 60 Cal.App.3d 687, 692–693; *Interdyne Co. v. SYS Computer Corp.* (1973) 31 Cal.App.3d 508, 511–512.)

Moreover, the agreements themselves did not contemplate any ongoing California-based activity. Rather, the agreements involved the purchase of shares in Swiss Stake, a Swiss entity, and entitled plaintiffs to receive CRV tokens, which would have allowed participation in the Curve DAO, a decentralized organization based, if anywhere, in Switzerland.

### D. Special Regulations

Finally, we reject plaintiffs' assertion that the exercise of jurisdiction is proper "because California has a strong interest in vindicating state-based investor rights from outside securities fraud." "The proper jurisdictional question is not whether the defendant can be liable" under state law, "but whether the defendant has purposefully directed its activities at the forum state . . . ." (*Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 983 & fn. 14) Even plaintiffs' cited case of *Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 539–540, assesses a state's interest in providing a forum to its residents under the third prong of the specific jurisdiction analysis,

considering whether the exercise of jurisdiction is reasonable. (See also *Anglo Irish Bank*, at p. 979.) Thus, California's interest in providing its residents with redress, alone, "cannot justify the exercise of personal jurisdiction over a nonresident defendant absent some form of purposeful availment by the defendant." (*HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1173.)

By way of purported analogy, plaintiffs cite *Bresler v. Stavros* (1983) 141 Cal.App.3d 365, 369, which found a foreign defendant with a California medical license purposefully availed himself of California's forum benefits by purchasing California securities in the form of "the entire stock of a California medical corporation," while also performing medical services during his California visits, and thus as "a purchaser of California securities, . . . subjected himself to both the protections and the potential liabilities established by the Corporate Securities Law of 1968." By contrast, here, plaintiffs, not Egorov, purchased the securities, which, "[f]or avoidance of doubt," are the shares in Swiss Stake, a Swiss entity operating under Swiss law. And, as part of the purchase, the parties entered into an agreement drafted by plaintiffs to apply Swiss substantive law, not California law. Thus, we fail to see how Egorov benefited from the protections of California securities law and decline to find purposeful availment based on statutory claims without any related California-based conduct. (*HealthMarkets, Inc. v. Superior Court*, *supra*, 171 Cal.App.4th at p. 1173.)

Based on our independent review, plaintiffs' evidence does not demonstrate purposeful availment under any test; thus, we do not reach plaintiffs' arguments about the remaining prongs of the specific jurisdiction analysis (i.e., whether the controversy relates to or arises out of Egorov's

contacts with California and whether the exercise of jurisdiction comports with fair play and substantial justice).

### III.  Jurisdictional Discovery

With respect to jurisdictional discovery, plaintiffs assert that the trial court denied their request "on improper grounds," and further argue that the court abused its discretion by denying plaintiffs' request in the face of their proffered evidence.  We disagree.

Because plaintiffs bear the burden of showing facts justifying the existence of jurisdiction in California, they are "entitled to an opportunity" to conduct relevant discovery.  (*Automobile Antitrust Cases*, *supra*, 135 Cal.App.4th at pp. 110, 127.)  But "to prevail on a motion for a continuance for jurisdictional discovery, the plaintiff should demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction." (*Id*. at p. 127.)  A ruling on a request for jurisdictional discovery "lies in the trial court's discretion" and will not be disturbed on appeal "unless we find a manifest abuse of that discretion."  (*Ibid.*)

For their first argument, plaintiffs seize on the trial court's comment at the hearing that it had "been burned too many times."  But plaintiffs do so to the exclusion of the court's subsequent order, which makes no mention of the court being "burned" and articulates an appropriate legal basis:  " 'In order to prevail on a motion for a continuance for jurisdictional discovery, the plaintiff should demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction.' ([*Automobile Antitrust Cases*, *supra*,] 135 Cal.App.4th [at p.] 127.)  Plaintiffs do not meet that burden."[11]

---

[11] In any event, "a judge's comments in oral argument may never be used to impeach the final order, however valuable to illustrate the court's theory they might be under some circumstances." (*Jespersen v. Zubiate-*

21

Plaintiffs assert error because the court's order "says nothing of Plaintiffs' ability to uncover evidence supporting specific jurisdiction." But the court's order merely mirrored plaintiffs' request for a continuance, which itself did not say anything about plaintiffs' ability to uncover evidence supporting specific jurisdiction. In that context, we have no issue with the court's determination, "Defendant has not lived in California since 2018 and plaintiffs' desire to test defendant's credibility based on statements that are not necessarily contradictory are insufficient."

We likewise reject plaintiffs' remaining arguments that the court abused its discretion in denying discovery. Before the trial court, plaintiffs represented that they "served five sets of jurisdictional discovery requests to Egorov's counsel," but never provided copies of the discovery, described the substance of the requests, or otherwise identified what jurisdictional facts they were seeking. "Because Plaintiffs failed to articulate what specific facts they would seek to develop if granted a continuance, the trial court could reasonably conclude that Plaintiffs did not 'demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction.' " (*Preciado v. Freightliner Custom Chassis Corp.* (2023) 87 Cal.App.5th 964, 973.)

To the extent plaintiffs provided any detail to the trial court, they identified a single area of inquiry: "Egorov's contradictory" and purportedly "false statements" regarding "the nature and scope of his California contacts." However, any inconsistencies, even if false, would not give rise to jurisdictional facts. For example, plaintiffs argue, "Egorov likely lied about when he sought Swiss citizenship," noting inconsistencies between Egorov's

*Beauchamp* (2003) 114 Cal.App.4th 624, 633; accord, *Key v. Tyler* (2019) 34 Cal.App.5th 505, 539, fn. 16.)

declarations and Telegram messages about the date he purportedly moved to Switzerland.  But it is undisputed that Egorov moved to Switzerland *from* Washington, where he had lived since January 2018.  Thus, regardless of whether Egorov moved to Switzerland in March or August of 2020, discovery into the matter would not likely produce facts supporting California's exercise of jurisdiction, either general or specific.  Therefore, plaintiffs fail to demonstrate that the trial court abused its discretion in denying leave to conduct jurisdictional discovery.

## DISPOSITION

The order granting Egorov's motion to quash and denying leave to conduct jurisdictional discovery is affirmed.  Egorov is entitled to recover any costs of appeal.

23

_____

DESAUTELS, J.

We concur:

_____

STEWART, P.J.

_____

RICHMAN, J.

*ParaFi Digital Opportunities LP et al. v. Egorov* (A168960)

Trial Court:                     San Francisco County Superior Court

Trial Judge:                     Hon. Richard B. Ulmer

Attorneys for Plaintiffs and     Latham & Watkins LLP
Appellants:                      Scott D. Joiner
                                 Ward A. Penfold

                                 Nima H. Mohebbi
                                 Tara A. McCortney
                                 Michael E. Bern, admitted *pro hac vice*

Attorneys for Defendant          DLA Piper LLP
and Respondent:                  Michael Fluhr
                                 Matthew F. Miller
                                 Eric C. Hall
                                 Stanley J. Panikowski